## COMMONWEALTH *vs.* JOSEPH WATSON.

Suffolk. September 12, 1978. — April 13, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Argument by counsel, Comment by judge, New trial, Capital case. *Evidence,* Self-serving statement, Verbal completeness, Admissions and confessions, Tape recording, Cross-examination.

Where defense counsel at a murder trial exceeded the bounds of proper argument by implying that three eyewitnesses could not identify the defendant as the gunman when in fact they were prevented from being asked to do so by a suppression order, the judge's corrective comments did not on the whole constitute reversible error although it would have been preferable for him to avoid reference to defense counsel's role in suppressing the identification testimony. [821-823]

Discussion of the doctrine of "verbal completeness." [826-831]

The defendant in a criminal case was not entitled to have a tape recording of an entire police interrogation of the defendant admitted in evidence by the fact that the judge permitted the prosecution to introduce a brief portion of the tape which contained a false statement by the defendant as to his whereabouts when the crime occurred. [831-834]

At a criminal trial, the judge did not abuse his discretion in excluding the playing of a tape recording of the defendant's interrogation by police, offered to show that the defendant had a pronounced Spanish accent and that he was drunk at the time of the questioning and did not understand certain of the questions, where there was a risk inherent in permitting the jury to hear such a large amount of evidence which should not be considered for the truth of the statements included therein. [834-836]

At a criminal trial, the judge did not unduly restrict the scope of cross-examination. [836-837]

A judge did not abuse his discretion in denying a motion for a new trial based on the fact that a key prosecution witness had informed defense attorneys that she had lied in her testimony at trial and had instructed her daughter to lie where the judge was not present-

ed with any testimony by the allegedly recanting witnesses and the testimony of another witness as to what one of the recanting witnesses told him failed to spell out clearly in what particulars the recanting witnesses had testified falsely at the defendant's trial. [837-839]

INDICTMENT found and returned in the Superior Court on February 5, 1976.

The case was tried before *Roy*, J., and a motion for a new trial was heard by him.

*Clyde D. Bergstresser* for the defendant.

*Frances M. Burns*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant Joseph Watson was convicted of the murder in the first degree of Marshall Joseph Ely. After entering his appeal in this court, he filed a motion for a new trial pursuant to G. L. c. 278, § 29, resting in part on the alleged recantation by one of the Commonwealth's main witnesses of the testimony she had given at the defendant's trial. The motion was remitted to the Superior Court for hearing and determination. G. L. c. 278, § 33E.

After an evidentiary hearing, the motion for a new trial was denied. The defendant's appeal from this denial was allowed to be filed by a single justice of this court, and has been consolidated with the pending appeal from the conviction. The defendant now argues four assignments of error: (1) the trial judge's charge regarding identification testimony, (2) the exclusion of a tape recording and transcript of the defendant's statement to the police, (3) the limitation of the scope of cross-examination of certain prosecution witnesses, and (4) the denial of the motion for a new trial. He also requests relief under G. L. c. 278, § 33E.[1] We conclude that there was no error and that the defendant is entitled to no relief under G. L. c. 278, § 33E, and we therefore affirm the judgment.

---

[1] The defendant explicitly waived his other assignments of error in his brief.

Four eyewitnesses described the events culminating in the fatal shooting of Ely on November 20, 1975. Their accounts, despite minor variations, are consistent. Three of them, Richard W. Birch, Jeffrey Fleisher, and Dennis Beebe, were college students at the time of the murder, and had gone to the Lenox Street housing project in Roxbury to conduct a survey as part of their studies. At approximately 3 P.M., they were interviewing Manson Upchurch, a neighborhood resident, in a courtyard of the project near 25 Trotter Court. All four men were standing close to Upchurch's car, which was parked beside a wading pool in Trotter Court, when Ely, who knew Upchurch, walked over and sat down on the hood of the car. Ely joined intermittently in the conversation. A short time later, another man approached, faced Ely and said words to the effect of, "Look, I guess you know you're dead," or, "In a minute you're going to be dead," or, "The next thing you know, you're dead." Taking out a large revolver, the man shot Ely in the forehead.

The three students ran away when the first shot was fired, but two of them, Birch and Fleisher, heard a second shot. Upchurch, who heard three shots and observed the gunman stick the revolver in his belt and walk across the empty pool toward Lenox Street, then ran to call the police.

The identification of the gunman made by each of these four eyewitnesses is relevant to one of the defendant's claims of error; we therefore describe the circumstances surrounding it in some detail. Upchurch told police on the day of the murder that because of where he was standing he had not seen the man who fired the shots. Although summonsed to appear at the probable cause hearing on December 22, he did not testify. When summonsed before the grand jury on January 19, 1976, he testified, under oath, that he had not seen the gunman approach and was "around the corner" when he heard the shots. On a second appearance before the grand jury, on February 4, 1976, after being told that the penalty for

perjury in a capital case could be a life sentence, Up-church testified that he had been lying, that he had observed the shooting, and he identified the defendant, whom he did not know, as the gunman. At trial, he again identified the defendant as the man who had shot Ely.

When Birch first saw the defendant at a court appearance in the Municipal Court for the Roxbury District on or about December 15, 1975, he could not identify him as the gunman. At the time of the probable cause hearing on December 22, 1975, Birch and Beebe were out of town. Fleisher, who was present, did not identify the defendant as the man who had shot Ely.[2]

The following May, Birch, Beebe, and Fleisher were each separately shown an array of photographs of men cashing checks at a bank on the morning of the homicide, and the defendant's picture was among them. On that occasion, Birch for the first time identified the defendant as the man who did the shooting; Beebe and Fleisher stated that the hat and sunglasses the defendant wore in the photograph were similar to those the gunman had worn, but they did not identify the defendant himself. The judge suppressed any in-court or out-of-court identifications by these three witnesses, based on his finding that, "The salient memory, it seems to me, of all these witnesses, are not the individual but this hat and these glasses and perhaps the leather coat."[3] At trial, therefore, Birch, Beebe, and Fleisher testified that the assailant was a black male, in his twenties or thirties, at least six feet tall, wearing a leather jacket, a hat, and sunglasses, but

[2] According to an affidavit sworn to by Fleisher and submitted as part of the defendant's motion for a new trial, Fleisher had informed the assistant district attorney, prior to his scheduled appearance before the grand jury, that, "I had seen Joseph Watson at the probable cause hearing and that I did not believe he was the assailant." Fleisher never testified before the grand jury.

[3] When viewing the photographs, Fleisher had identified a leather jacket worn in one of the pictures as the same type of jacket the gunman had on, "Although this is not the man."

they did not identify the defendant as the gunman. All three agreed they had noticed no accent in the assailant's speech. Upchurch also described the gunman as wearing a leather jacket, eyeglasses, and a hat.[4]

The defendant's former girl friend, Charlotte Crawford, and her sixteen year old daughter Laverne Crawford testified for the Commonwealth. Charlotte testified that she had lived with the defendant for "four years off and on," and had had two children by him, but had stopped living with him five to seven months before the murder. She stated that at the time of the shooting she had known Ely about six months. At approximately 11 A.M. on November 20, 1975, according to Charlotte's testimony, Ely came to her apartment. While he was there, she received a telephone call from Watson, who said he had just seen Ely at a store and "I started to kick his ass." She hung up, and Ely left. She also testified about two other telephone calls from Watson: one on the day after the shooting of Ely, in which Watson said: "he was sorry to hear that Marshall [Ely] was dead" and the other on the day of Watson's arrest one and one-half weeks later, in which he told her he had seen Ely with a gun.[5] On cross-examination she testified that she and Watson were not on friendly terms the previous November and Decem-

---

[4] There were slight variations in the details of this testimony. Birch described the jacket as brown and waist length, and the hat as brown. Fleisher testified the jacket was dark brown and thigh length, and the hat black; Beebe that the jacket was light brown and hip length; and Upchurch that the jacket was brown and thigh length.

[5] According to affidavits submitted with the defendant's new trial motion, Charlotte Crawford later informed a minister, A. Donald Moberger, and the defendant's attorneys that this testimony was a lie she invented to implicate the defendant to get even with him for his leaving her. At the hearing on the new trial motion, on the advice of counsel appointed to represent her, Charlotte Crawford refused, on Fifth Amendment grounds, to answer any question about this alleged recantation. However, the Reverend Moberger did testify that Charlotte had told him on a number of occasions that she had lied in her testimony and that she had instructed her daughter, Laverne, also to make up a story.

ber and that the defendant had never met or seen Ely prior to November 20.

Laverne Crawford testified that the defendant had lived with her and her mother for about five years, but that he had moved out about two months before the shooting. She said she had known Ely for about two months prior to his death and that he was friendly with her mother, that on November 19, the night before the shooting of Ely, she had gone to visit the defendant at his apartment at 54 Rutland Square with her half-sister, Watson's daughter, and the defendant had shown her two guns and told her "that he was going to kill Marshall the next day." She said he frequently showed her the guns when she visited, which she did about twice a week, and that the defendant had been threatening to kill Ely for about one year.

Laverne stated that at about 3 P.M. on November 20 she was walking through the empty wading pool in Trotter Court on her way home from school when she saw the defendant "walking fast" toward Lenox Street. He was about four feet away from her, wearing a long black below the knee length leather coat, sunglasses and no hat; they did not speak. She then went over to look at Ely's body which was lying on the hood of the car and then went home to tell her mother.

The next night, Friday, November 21, Laverne and a girl friend of hers went to see the defendant at his apartment. Laverne asked him for some money for a class trip to New York. The defendant gave her the money and a bus ticket and told her he had been in New York on Thursday. During cross-examination the defense established that in her statement to the police on the night of the shooting, and at the probable cause hearing in December, Laverne had referred to seeing one gun at the defendant's apartment, not two, and that in the District Court she had testified that the defendant was wearing eyeglasses, not sunglasses. She also stated she had seen two or three young white college students standing beside

Trotter Court later that afternoon.[6] On redirect examination Laverne identified a .32 caliber handgun as the one which Watson had shown her at his apartment. This gun had been discovered, pursuant to a search warrant, under a couch in the common living room on the first floor of the rooming house at 54 Rutland Square where the defendant rented an apartment on the third floor. A police department ballistician later testified that this gun was definitely not the murder weapon.

The medical examiner testified that the victim had received three gunshot wounds, a head wound being the cause of death. One bullet passed through the body, but the other two bullets were recovered from Ely's body at the autopsy. The police ballistician who examined them testified that they were .38 caliber, and therefore could not have been fired by the .32 caliber gun in evidence.

Police Sergeant Detective Francis A. O'Meara described his questioning of the defendant at about 5 or 5:30 P.M. on December 2, 1975, the day of his arrest. A tape recording had been made of the approximately ten-minute interview, but over defense counsel's objections, the judge excluded both the tape and a typed transcript of the tape from evidence. (See further discussion of this subject in part 2 of this opinion.) Instead, Sergeant O'Meara testified to one small portion of the interrogation, concerning the defendant's whereabouts on the afternoon of the homicide. The defendant replied that he was cashing his paycheck at the bank, paying a bill he owed, and visiting his girl friend.

The defendant's case consisted of three witnesses: Thurmutis Omega Moore, the defendant's landlady at 54 Rutland Square; Laverne Dean, Charlotte Crawford's mother; and Mr. Clyde D. Bergstresser, an attorney for the defendant. Moore testified that the gun taken by the police from her living room was her gun, not the defend-

---

[6] Fleisher testified that the three students never returned to Trotter Court after the shots were fired.

ant's,[7] and that Watson hed never seen or handled it. She
also described Laverne Crawford's visit to the defendant
on the evening of November 22, 1975. She said that she,
Laverne, and the defendant were sitting in the common
living room when Laverne asked for money for her class
trip, and that the defendant borrowed $5 from Moore and
gave it to Laverne.

Laverne Dean testified that she had known the defend-
ant for a long time and that his reputation was good—"I
never heard anyone say anything bad about him." She
also stated that he spoke with a "Cuban and Spanish"
accent. Mr. Bergstresser testified that he interviewed the
defendant in jail on the night of his arrest, that he
smelled alcohol on his breath, and that he noticed the
defendant had a Spanish accent and slur in his speech.

1. *The Judge's Charge on Identification Testimony.*

During the defendant's closing argument, his counsel
said: "The rules of evidence require some things not to be
presented to a jury. But certainly it is the fact that not
one of those three white students, anxious to tell the
truth and do their duty, pointed to that man and identi-
fied him as the man they saw there that day, and they
had him on view in this courtroom for hours. It is for you
to draw the inference from the fact that they did not
identify him in the courtroom." Although the Common-
wealth did not object to this argument, the judge referred
to it during his charge to the jury as follows: "[D]uring the
argument of defense counsel he commented upon the fact
that none of these white witnesses identified this defend-
ant. That should not have been said, and you are to disre-
gard it, and I'll tell you the reason why. At the request of
the defendant's lawyer, I held a preliminary hearing, and
he was seeking to prevent those three white witnesses
from making any in-court identification of this defend-

---

[7] Moore was uncertain in her identification of the gun, but the
Commonwealth agrees in its brief that she did indicate "that the
revolver in question belonged to her."

ant. Because of a photographic procedure, my ruling was that none of those three witnesses would be permitted to be asked the question in court as to whether or not they could identify this defendant. Therefore, that being so, you are not to speculate or surmise as to whether or not any of these three witnesses would or would not have identified this defendant if they had been permitted so to be asked that question."

Defense counsel's comments exceeded the bounds of proper argument, for they left the jury with the impression that none of the three white witnesses could identify the defendant as the gunman, when in fact they were prevented from being asked to do so by the suppression order.[8] This argument fell outside "the bounds of the evidence and the fair inferences from the evidence," *Commonwealth* v. *Pettie*, 363 Mass. 836, 840 (1973), and cases cited therein, and *Commonwealth* v. *Burke*, 373 Mass. 569, 574-575 (1977), and therefore it was improper.[9]

The defendant contends that even assuming this impropriety, the judge's corrective comments were prejudicially misleading and erroneous. In particular, he argues that the words, "At the request of the defendant's lawyer, I held a preliminary hearing, and he was seeking to prevent those three white witnesses from making any in-

---

[8] Judging by the testimony at the voir dire hearing on the suppression motion, Birch, if allowed to do so, probably would have identified the defendant at the trial as the person who shot Ely, and Beebe and Fleisher, if asked at the trial, probably would not have done so. Defense counsel, after hearing this testimony, orally waived his suppression motion as to Beebe and Fleisher, but made no objection when the judge explicitly excluded the identification testimony of all three witnesses. Defense counsel agreed later in the trial that it would be improper for him to introduce evidence of Fleisher's prior statement that the defendant was not the gunman in view of the suppression ruling. Of course, it is impossible to know with certainty whether any of the three witnesses would or would not have identified the defendant at trial if they had been asked; the salient point is that the question was not permitted to be raised.

[9] At oral argument, defense counsel conceded that his remarks on lack of identification fell outside the bounds of proper argument.

court identification of this defendant," must have caused the jury to conclude that but for a technicality invoked by the defendant's lawyer, all three witnesses would have positively identified the defendant as the man that did the shooting.

The judge's right—indeed, his duty—to correct the improper argument of counsel is not in issue. *Commonwealth* v. *Pettie*, 363 Mass. 836, 841 (1973). *Commonwealth* v. *Richmond*, 207 Mass. 240, 250 (1911). In so doing, "he has considerable latitude in his choice of methods to insure that end." *Commonwealth* v. *Clark*, 3 Mass. App. Ct. 481, 488 (1975). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 56 (1975). *Commonwealth* v. *Witschi*, 301 Mass. 459, 462 (1938). It is true that a judge's words may make an extremely strong impression on the jury, see *Commonwealth* v. *Goulet*, 374 Mass. 404, 410 (1978); *Commonwealth* v. *Earltop*, 372 Mass. 199, 206-207 (1977) (Hennessey, C.J., concurring), and it is unfortunate here if even the implication that the defendant was keeping positive identifications from the jury was created. However, the judge's final words were a clear direction to the jury that "you are not to speculate or surmise as to whether or not any of these three witnesses would or would not have identified this defendant if they had been permitted so to be asked that question." The judge did not interrupt counsel during his argument, as would have been his right, see *Commonwealth* v. *Pettie*, 363 Mass. 836, 841 (1973), and *Commonwealth* v. *O'Connell*, 274 Mass. 315, 323 (1931), nor did he "express any opinion as to the guilt of the defendant nor suggest to the jury the conclusion which they should reach." *Commonwealth* v. *Witschi*, 301 Mass. 459, 462 (1938). Although it would have been preferable to avoid any reference to defense counsel's role in suppressing the identification testimony, we cannot say as a whole that the judge's comments constituted error in the circumstances.

2. *Exclusion of Evidence of a Portion of Police Interrogation of the Defendant.*

The homicide in question occurred about 3 P.M. on November 20, 1975. The defendant was arrested on December 2, 1975, and about 5 or 5:30 P.M. on that day he was questioned by Sergeant Detective Francis A. O'Meara. Prior to any questioning, the defendant was given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and he voluntarily agreed to speak with the police. The entire interrogation which lasted about ten minutes was recorded on a tape. It was later transcribed by a police clerk, covering about seven pages of double-spaced typing. The prosecution furnished a copy of the tape and of the transcript to the defendant. The tape was reasonably audible, and the transcript substantially accurate.

Before admitting any evidence of what the defendant said to the police, the judge excused the jurors and held a voir dire during which the prosecutor stated that she intended to offer testimony by O'Meara about that portion of the interrogation which is reproduced in the margin below.[10] That included a question to the defendant as to where he was "about two-thirty or three o'clock" on the day of the homicide and the defendant's answer thereto, in part, that, "At that time I cashed my check at the First National Bank at Huntington Avenue, and I went over to Shawmut Avenue to pay a bill there." The prosecutor stated that there would be testimony from another witness that the check was cashed at about 9:10 A.M. on that day. It was later stipulated that the defendant cashed his pay check at the bank at 9:12 A.M. on November 20, 1975.

---

[10] Q. [O'Meara]: "Now, I want to talk to you about back to Thursday, November 20, 1975, about two-thirty or three o'clock in the afternoon." A. [Watson]: "Yes." Q.: "Where were you at that time, Joe?" A.: "At that time I cashed my check at the First National Bank at Huntington Avenue. I went over to Shawmut Avenue to pay a bill there." Q.: "I understand. Then where did you go?" A.: "I went to [my girl friend's] house." Q.: ". . . Where does she live? The same place I was around today?" A.: "Right, and I was drinking with her. I came back to my house about eight o'clock."

During the voir dire the judge read a copy of the police transcript of the interrogation of the defendant, and he listened to a playing of that part of the tape which covered the interrogation which the prosecutor had offered in evidence and which is set forth in note 10, *supra*. The judge, over the defendant's objection and exception, allowed O'Meara to read to the jury that limited part of the transcript offered by the prosecution, and he denied the defendant's motion that the tape of the entire interrogation be admitted in evidence and played to the jury. The tape and transcript of the interrogation were marked for identification and are available to us for hearing and reading.

The defendant's principal argument of error in the judge's refusal to admit evidence of the entire interrogation seems to be based on the doctrine of "verbal completeness." The defendant contends that because the Commonwealth offered, and the judge admitted, a limited part of the police interrogation of the defendant, he was entitled to have the entire interrogation admitted, either as a part of the Commonwealth's case or as a part of his cross-examination of O'Meara. He bases this argument almost entirely on the following statement in *Commonwealth* v. *Goddard,* 14 Gray 402, 404 (1860): "No principle is more familiar than that if one party puts in evidence a part of the admissions or conversations of the other, the latter is entitled to produce, or draw out by cross-examination, testimony concerning all that was said upon the occasion referred to. This is essential to render the part produced in evidence intelligible. The force and effect of particular expressions may be, and often are, greatly modified or affected by the connection in which they are uttered. And for this purpose, and to afford every needful explanation, all that was said at any interview bearing upon the subject of inquiry, of which only detached parts have been given in evidence, may be proved in behalf of those against whom the part only has been produced."

The defendant appears to rely primarily on the broad rule stated in the first sentence quoted above from the *Goddard* decision, without regard to the obvious modification or limitation of the rule in the several sentences which follow the first. This court also seems to have taken a similar position in *Farley* v. *Rodocanachi*, 100 Mass. 427, 429 (1868) where, without citing any precedent, it said: "The defendant, in his examination as a witness, was properly permitted to testify to what was said to him by the plaintiff, as a part of one of the conversations deemed material by the plaintiff, a portion of which he had testified to; upon the familiar principle, that, when a part of a conversation or admission is introduced, the other side may prove all that was said."

Notwithstanding the broad statement in the *Goddard* decision, the doctrine of "verbal completeness" as applied by many of our decisions is more limited in scope. In *Commonwealth* v. *Keyes*, 11 Gray 323, 324 (1858), the rule was stated with a limitation as follows: "It is undoubtedly the general rule that whenever the statements, declarations or admissions of a party are made subjects of proof, *all that was said by him at the same time and upon the same subject is admissible in his favor*, and the whole should be taken and considered together" (emphasis supplied). *Dole* v. *Wooldredge*, 142 Mass. 161, 183-184 (1886). *Commonwealth* v. *Campbell*, 155 Mass. 537, 538-539 (1892). In *Commonwealth* v. *Trefethen*, 157 Mass. 180, 197 (1892), we said: "If any part of a conversation with the defendant put in evidence tends to show directly or indirectly that he is guilty of the crime charged, the defendant has the right to have put in evidence all that was said to and by him at the same time, and relating to the same subject, although it is in his favor." Substantially similar language was used in *Commonwealth* v. *Britland*, 300 Mass. 492, 496-497 (1938). In *Commonwealth* v. *Russell*, 160 Mass. 8, 9-10 (1893), the Commonwealth introduced evidence that the defendant acknowledged that a bottle containing whiskey and some glasses were his. The de-

fendant then offered evidence of a "statement, made immediately afterward while in the same room, in regard to the jug found in the barrel," and a statement made by him in the next room about corks on the floor. In upholding the exclusion of the defendant's evidence, the court said: "The Commonwealth did not offer his declarations in regard to any other matters than these two. *The defendant had a right to put in evidence anything which he said as a part of the same conversation that would tend to explain or qualify these answers, but he had no right to use his declarations in his own favor in regard to distinct and independent subjects of inquiry, even though these subjects were of a kindred character, and related to the same general issue*" (emphasis supplied). *Cusick* v. *Whitcomb*, 173 Mass. 330, 331 (1899). See *Commonwealth* v. *Monahan*, 349 Mass. 139, 168-169 (1965). Cf. *Sullivan* v. *Morse*, 271 Mass. 501, 504 (1930).

One of our more recent decisions recognizing the limitations on the broad rule of verbal completeness advocated by the defendant was *Commonwealth* v. *Schnackenberg*, 356 Mass. 65, 70-71 (1969). In that decision we noted that in *Commonwealth* v. *Britland*, 300 Mass. 492, 495-496 (1938), we had quoted the rather broad rule of verbal completeness from the *Goddard* decision, but we then distinguished the *Britland* decision by reference to limitations to the rule. We then restated our rule, with limitations, by quoting the following language from our *Keyes* decision of 1858: "whenever the statements, declarations or admissions of a party are made subjects of proof, all that was said by him at the same time and upon the same subject is admissible in his favor, and the whole should be taken and considered together." *Id.* at 324.

In *Commonwealth* v. *Mormando*, 5 Mass. App. Ct. 815 (1977), and *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. 250, 255-256 (1974), the Appeals Court recognized and applied the same limitations to the rule of "verbal completeness." See *Commonwealth* v. *Murphy*, 6 Mass. App. Ct. 335, 342-343 (1978).

The law on this subject as it has developed and been applied in this Commonwealth in the period of more than a century as evidenced by the decisions described above is stated as follows in W. B. Leach & P. J. Liacos, Massachusetts Evidence 320 (4th ed. 1967): "Whenever statements of a person are put in evidence, all that was said or written by him at the same time and upon the same subject becomes admissible; but other statements, even though made at the same time, are not admissible unless they are upon the same subject matter." The rule is stated as follows in McCormick, Evidence § 56, at 130 (2d ed. 1972): "The prevailing practice seems to permit the proponent to prove only such part [of a writing or of an oral statement or conversation] as he desires. It seems, however, that to guard against the danger of an ineradicable false first impression, the adversary should be permitted, at least within the court's discretion, to require the proponent to prove so much as pertains to the fact sought to be proved, that is, all that explains or is useful in interpreting the part proved." The Massachusetts rule on this subject is described in substantially the same language quoted above in K. B. Hughes, Evidence § 209 (1961).

In 1 C. Torcia, Wharton's Criminal Evidence § 162 (13th ed. 1973), the general rule and the limitation thereon are stated in the following language: "When part of a conversation, transaction, or writing is introduced by one party on either direct or cross-examination, the other party may, as a rule, introduce the entire conversation, transaction, or writing. Yet, irrelevant evidence should not be admitted simply because it is part of a conversation already received, and if questions, on reexamination, are not connected with the statements elicited on cross-examination, or are remote, they should be excluded. In other words, no more of the remainder of a conversation should be admitted than that which explains or qualifies the part already received" (footnotes omitted).

A more exhaustive treatment of the subject of "Verbal Completeness" may be found in 7 J. Wigmore, Evidence, c. 73, §§ 2094-2125, at 653-659 (Chadbourn rev. ed. 1978). After a lengthy general discussion this treatise contains the following comments of pertinence to the issue before us (plus annotations and footnotes omitted from this quotation): "For the reasons already sufficiently examined (§ 2094, *supra)* the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance . . . . This right of the opponent to put in the remainder is universally conceded, for every kind of utterance without distinction; and the only question can be as to the scope and limits of the right.

"The ensuing controversies are in effect concerned merely with drawing the line so that the opponent shall not, under cloak of this conceded right, put in utterances which do not come within its principle and would be otherwise irrelevant and inadmissible. In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely: (a) *No utterance irrelevant to the issue* is receivable; (b) *No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part,* is receivable; (c) *The remainder* thus received merely *aids in the construction of the utterance as a whole,* and is not in itself testimony. . . .

"(b) Second, *no more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable.* This limitation is the logical result of the principle on which the rule rests. But it has not been commonly observed in defining the rule. The usual phrase is that the 'whole' of the utterance—i.e., the remainder of the whole — may be put in . . . . But this liberal allowance cannot, in theory at least, be defended. The single purpose of considering the utterance as a whole is to be able to put a correct construction upon the

part which the first party relies upon, and to avoid the danger of mistaking the effect of a fragment whose meaning is modified by a later or prior part (§ 2094, *supra*). It follows that the purpose is accomplished when the tribunal has had placed before it the remaining parts which may modify or explain the first part . . . . The simple rule, in the form today most commonly enforced, that 'the whole of what was said at the same time on the same subject' may be put in, has proved easily workable, and has been attended by no technical refinements in its use." (All emphasis contained in the quotations above was included in the original text.)

There are many cases from other jurisdictions which apply the same limited rule of "verbal completeness" which is applied in this Commonwealth, but it may suffice to refer to only a few. In *United States* v. *Dennis*, 183 F.2d 201, 229-230 (2d Cir. 1950), aff'd 341 U.S. 494 (1951), the court said: "As to the admission of documents, the judge allowed the prosecution to put in evidence such passages as he thought relevant to support the charge; but he allowed the defense to put in only those other passages which contradicted, modified, or otherwise threw any light upon the prosecution's passages. The defendants insist that either the whole document, or no part of it, was competent. There is no such rule; on the contrary it is well settled that only those parts of a document which throw light upon the parts already admitted become competent upon its introduction. The question is again one of discretion, and the defendants have not shown that what was excluded was competent under this rule." Some of this same language was repeated in *Camps* v. *New York City Transit Auth.*, 261 F.2d 320, 322 (2d Cir. 1958), and the court added: "The 'rule of completeness,' which does permit the further use of the document to explain the portion already in evidence as fully as the document may allow, does not extend to portions which are irrelevant to the initial use."

In *United States* v. *Corrigan,* 168 F.2d 641, 645 (2d Cir. 1948), one party sought to admit some evidence on the ground that the other party had "opened the door" on the subject. The court said: "The doctrine of 'opening the door' is an application of the principle of 'completeness'; that is, if one party to litigation puts in evidence part of a document, or a correspondence or a conversation, which is detrimental to the opposing party, the latter may introduce the balance of the document, correspondence or conversation in order to explain or rebut the adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary. . . . [Quotation from 7 J. Wigmore, Evidence §§ 2094, 2104, 2113, 2119 and 2120 omitted (3d. ed.)]. The effect of 'opening the door' has been well and tersely defined in *Hayden* v. *Hoadley,* 94 Vt. 345, 349 . . . [1920]: '[The rule] is protective, merely. It goes only so far as is necessary to shield a party from adverse inferences, and only allows an explanation or rebuttal of the evidence received.' "

We turn now to the application of the "verbal completeness" rule to the case before us. Here the transcript of the tape recorded interrogation of the defendant by the police covered seven typewritten pages. The judge allowed only twelve lines, about one-third of one page, of that transcript to be read to the jury. It is on the basis of the admission of those twelve lines that the defendant contends that he was entitled to have the entire statement introduced in evidence, either by the testimony of Sergeant Detective O'Meara, or in the form of the tape or of the transcript thereof. We disagree.

It is undisputed that if the defendant intentionally made false statements as to material facts when interrogated by the police, "such statements could be considered by the jury as showing a consciousness of guilt," and that evidence thereof was admissible. *Commonwealth* v. *Barber,* 261 Mass. 281, 288 (1927), and cases cited therein. *Commonwealth* v. *Leland,* 311 Mass. 447, 456 (1942).

*Commonwealth* v. *Torrealba*, 316 Mass. 24, 30 (1944).
Since such statements are of the nature of admissions,
the defendant in such a case has the right to introduce
any evidence which either explains or contradicts the
apparent admission. If the evidence used to prove the
admission consists of a part of a statement, whether oral
or written, by the defendant, he has the right to offer any
other part of the same statement which tends to explain
or disprove the claimed admission, but that does not
necessarily render the defendant's entire statement ad-
missible regardless of content or relationship to the part
claimed to have constituted an admission.

The limited portion of the interrogation offered by the
prosecution and admitted by the judge dealt solely with
the whereabouts of the defendant at 2:30 to 3 P.M. on the
date of the homicide. In that part of the interrogation the
defendant told the police that about that time he was
cashing his pay check at a bank on Huntington Avenue
in Boston, that he then proceeded to the home of a friend
on Shawmut Avenue, also in Boston, and that he then
went to his girl friend's house and remained there until
about 8 P.M. As already noted above, the parties later
stipulated that the defendant in fact cashed the check at
9:12 A.M. on that day.

After listening to the tape and reading the transcript
of the police interrogation of the defendant we conclude
that the judge admitted everything contained therein
which related to the defendant's alleged false statement
as to his whereabouts at the approximate time of the
homicide. The portions of the interrogation which the
judge excluded related to statements by the defendant
which may be summarized as follows: (a) he learned from
a friend that the police were looking for him in connec-
tion with the shooting of Ely, (b) he did not know Ely, and
because he did not know him he never saw or talked to
him, (c) he formerly lived with Charlotte Crawford, she
told him she was going to testify against him, he never
told her that he had shot Ely, he is the father of two of

her children, she now hates him because he complained to the welfare department about her, and that she put her daughter Laverne up to testifying against him, and (d) he did not own a gun, he never told Laverne that he owned a gun and never showed her a gun, and he never told her that he was going to shoot Ely.

While some or all of the statements made by the defendant to the police and excluded by the judge may be relevant to the issues involved in the trial, and might be admissible if offered through testimony of the defendant or of some other qualified witness, it does not follow that the defendant can compel the admission in evidence of the entire statement simply because the prosecutor offered the small part which she claims amounted to a false statement by the defendant as to where he was when Ely was shot. That would indeed be extending the "completeness rule" to an illogical conclusion. It would permit a defendant to make a statement containing an admission and then load it with any amount of self-serving statements and thereby effectively preclude the introduction of the admission in evidence without automatically rendering all of the self-serving statements admissible at his own option. While statements are sometimes admissible notwithstanding the fact that they are self-serving, there must be a basis for their admissibility other than the fact that they were uttered as a part of another statement which has been offered in evidence. *Commonwealth* v. *Fatalo,* 345 Mass. 85, 87 (1962), and cases cited therein. They might be admissible notwithstanding the fact that they are self-serving if they "would tend to explain or qualify [the part of the statement which was admitted, but the defendant would have] no right to use his declarations in his own favor in regard to distinct and independent subjects of inquiry, even though these subjects were of a kindred character and related to the same general issue." *Commonwealth* v. *Russell,* 160 Mass. 8, 10 (1893).

The statements which the defendant offered and the judge excluded do not qualify for admission under the

"completeness rule" as it applies in this Commonwealth, and the exclusion of those statements from evidence was not error.

3. *Tape Recording of Interrogation.*

The defendant contends that there was a special reason which required the judge to admit the tape recording of the police interrogation in this case. In doing so the defendant does not contend that he was entitled to have the tape admitted under the "best evidence rule," and in fact states in his brief that "the Best Evidence Rule does not apply to tape recordings," *Kortz* v. *Guardian Life Ins. Co.,* 144 F.2d 676 (10th Cir.), cert. denied, 323 U.S. 728 (1944). Rather, he argues "that the purpose of the request to use the actual tape was to expose the jury to the heavy Spanish accent of the defendant, to demonstrate that the defendant was drunk at the time of questioning and that from the manner in which the questions were being answered that he did not comprehend the questions."

There is no rule of law in this Commonwealth which either requires or prohibits the use of a tape recording to prove a conversation which is relevant to an issue involved in a trial. "Tape recordings should . . . be admitted if properly verified, but since the Best Evidence Rule does not apply, a witness may testify as to the conversation he overheard." W. B. Leach & P. J. Liacos, Massachusetts Evidence 291-292 (4th ed. 1967).

While we have no direct judicial precedents on this subject in this Commonwealth, there are decisions from other jurisdictions which seem to leave the decision whether to admit an otherwise relevant tape recording to the sound discretion of the trial judge. *United States* v. *DiMuro,* 540 F.2d 503, 512 (1st Cir. 1976), cert. denied, 429 U.S. 1038 (1977). *Gorin* v. *United States,* 313 F.2d 641 (1st Cir. 1963), cert. denied, 379 U.S. 971 (1965). In the recent case of *United States* v. *Nashawaty,* 571 F.2d 71 (1st Cir. 1978), the court approved the decision of a judge of the District Court to admit tapes of conversations between the defendant in an arson case and a government witness;

it also approved the distribution of typed transcripts to the jury as an aid in following the tapes, so long as "[t]he court properly instructed the jury to rely only on what it heard, not on what it read" (*id.* at 75).

A number of State courts have recognized the value of tape recordings in the fact-finding process. In *People* v. *Harding,* 44 App. Div. 2d 800, 801 (N.Y. 1974), the court held it was reversible error to exclude a tape recording and admit only the typed transcript, saying, "The fact that the transcript made of the recorded telephone conversation was concededly correct fails to ameliorate the fact that the tape and not the transcript constitutes the best evidence of the nature of the conversation. The defendant should not have been deprived of the opportunity of having the jury *hear* the words spoken and evaluating the inflection and tone of voice."

See also *Lopez* v. *United States,* 373 U.S. 427, 440 (1963), (recording of defendant's bribery of government agent admitted: "The function of a criminal trial is to seek out and determine the truth or falsity of the charges .... Proper fulfillment of this function requires that ... all relevant, competent evidence be admissible"); *People* v. *Hayes,* 21 Cal. App. 2d 320, 322 (1937) (admission of sound movie of defendant's confession "is to be commended as of inestimable value to triers of fact in reaching accurate conclusions); *People* v. *Frison,* 25 Mich. App. 146, 147-148 (1970); *Sanders* v. *State,* 237 Miss. 772 (1959); *State* v. *Perkins,* 355 Mo. 851, 859 (1946); *State* v. *Porter,* 125 Mont. 503, 513 (1952); *Williams* v. *State,* 93 Okla. Crim. 260, 270-271 (1951) (admission of a recorded interrogation "should be of much more value to the court and the jury than a confession taken in shorthand and later reduced to writing"); *State* v. *Reyes,* 209 Or. 595, 636 (1957) (recorded confession admitted, "Indeed, a recording has value as evidence which is frequently wanting in a signed confession, for it reproduces the very words ... in his own voice and with all the added meaning and significance that comes from inflection, emphasis, and the other attributes of speech").

At this point we consider the defendant's contention that he was entitled to have the tape of his entire interrogation by the police played to the jury. This contention is related to evidence by witnesses who were present at the shooting of Ely that the person who did the shooting spoke without an accent and that his speech was not slurred. The defendant contends that the playing of the tape would give the jury evidence that he spoke with a Spanish accent and that he was drunk at the time of the interrogation and did not understand certain of the questions. The defendant disclaimed any intention of offering the tape for the purpose of proving the truth of what he said. If the entire tape were played for the jury that would effectively place within the hearing of the jury the very language which is contained within the six and two-thirds pages of the transcript which we have held in part 2 of this opinion to have been properly excluded by the judge. Even with careful limiting instructions by the judge there was a risk inherent in permitting the jury to hear such a large amount of evidence which should not be considered for the truth of the statements included therein. In these circumstances the judge did not abuse his discretion in excluding the playing of the tape.

4. *Limits on the Scope of Cross-examination.*

The defendant contends that the judge erred in unduly restricting the scope of his cross-examination in four instances: first, in cutting off further questioning of the witness Charlotte Crawford about the contents of a statement she had made to the police; second, in excluding an answer the same witness made about what the defendant had said to her over the telephone; third, in limiting questioning of the witness Manson Upchurch about why he had changed his testimony before the grand jury; and fourth, in excluding certain questions asked of the witness Richard Birch about his grand jury testimony. We hold that the judge's rulings fell within the limits of his discretion.

Without describing the facts relevant to each claim of error in great detail, it is sufficient to note that in the first, third, and fourth instances mentioned above, the judge's rulings did not totally exclude cross-examination about a given subject, but only limited additional questions on that subject once it had already been raised and explored to some extent before the jury. A judge certainly has wide discretion to limit repetitive or redundant cross-examination, and there was no showing that the judge's action on these matters unfairly impaired the defendant's right of cross-examination. *Davis* v. *Alaska*, 415 U.S. 308, 316 (1974). *Commonwealth* v. *Dougan, ante* 303, 310 (1979). The defendant contends that in cutting off his questioning of Crawford the judge denied him the opportunity to demonstrate that she had not told the police about the contents of a certain telephone conversation with the defendant, contrary to her assertion on cross-examination that she had done so. But the defense attorney, in a colloquy with the judge at the bench, agreed that the police had not asked her about the contents of this conversation.

Finally, as to the second instance of which the defendant complains, the answers to the questions about what the defendant told the witness Crawford over the telephone were inadmissible hearsay. The defendant offers no argument as to why it was error to exclude them, and we hold that there was no error in this regard.

5. *The Denial of the Motion for a New Trial.*

The defendant moved for a new trial pursuant to G. L. c. 278, § 29, on the ground that Charlotte Crawford had informed the defense attorneys that she had lied in her testimony at trial in order to implicate the defendant and also had encouraged her daughter to lie. This motion was accompanied by an affidavit of Reverend A. Donald Moberger, stating that Charlotte Crawford had told him on several occasions that she had lied to the police about the murder and instructed her daughter Laverne to lie, and it was also accompanied by an affidavit of Mr. Clyde D.

Bergstresser, one of the defense attorneys, about his similar conversations with Charlotte Crawford.[11] Also attached to the motion were two letters from Crawford to Moberger which referred, somewhat vaguely, to lies by her and her daughter in their trial testimony. These letters were admitted as exhibits at the hearing on the new trial motion described below.

Charlotte Crawford appeared at the hearing on the motion for a new trial held on May 20, 1977, but after consulting with an attorney appointed by the judge to represent her, she stated under oath that she wished to take the Fifth Amendment in answer to all questions about her trial testimony. The Reverend Moberger testified at the same hearing that Charlotte Crawford had sent him the two letters referred to above, and had told him that she had lied at the trial "when in fact she knew [the defendant] was not guilty."

The judge denied the new trial motion, stating in his memorandum of decision that he did not "accept her [Charlotte Crawford's] 'recantation' (if it can be called that from what was introduced at the motion hearing) as trustworthy and believable." The defendant asks us to hold that this denial was an abuse of the judge's discretion.

A motion for a new trial based on affidavits or testimony suggesting that a key prosecution witness may have lied at the trial naturally merits serious consideration from the motion judge, but we have nevertheless held in several cases that such a motion need not be granted as a matter of law. *Commonwealth* v. *Leate*, 361 Mass. 347, 349 (1972). *Commonwealth* v. *Cassesso*, 360 Mass. 570, 575

---

[11] There was also an affidavit signed by the witness Jeffrey Fleisher stating that he had informed the assistant district attorney prior to trial that (1) he did not believe the defendant was the murderer, and (2) he believed Laverne Crawford had told several lies at the probable cause hearing. Fleisher did not testify at the hearing on the new trial motion, and the defendant does not now rest any claim of a right to a new trial on Fleisher's statements.

(1971), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972). *Commonwealth* v. *Robertson,* 357 Mass. 559, 562 (1970). *Commonwealth* v. *Gwizdoski,* 284 Mass. 578, 581 (1933). In the present case, the judge was not presented with any testimony by the allegedly recanting witnesses (nor even a signed affidavit), since Charlotte Crawford claimed her privilege against self-incrimination at the hearing and Laverne Crawford did not appear. The testimony of the Reverend Moberger failed to spell out clearly in what particulars Charlotte or Laverne Crawford testified falsely at the defendant's trial. Given this sketchy state of the record, we cannot say that the judge, who was intimately familiar with both the testimony at trial and at the hearing on the motion, abused his discretion in denying the motion for a new trial, or that manifest injustice would result from our affirming his denial of the motion.

6. *Review under G. L. c. 278, § 33E.*

The evidence in this case suggests no sufficient reason why intervention under § 33E would be appropriate. This is not a case where a lesser verdict of manslaughter or murder in the second degree might be called for. There was testimony by four eyewitnesses which, if believed, supports the verdict that the homicide was a deliberate, premeditated act. After thorough review of the record, we affirm the judgment of guilty of murder in the first degree.

*So ordered.*