Commonwealth *vs.* Robert M. Tobin.

Suffolk. March 6, 1984. — August 6, 1984.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & Lynch, JJ.

*Bribery. Evidence,* Other offense, Relevancy and materiality. *Error,* Harmless. *Practice, Criminal,* Required finding, New trial, Disclosure of evidence.

At the trial of a deputy sheriff charged with violations of G. L. c. 268A, § 2 (*b*), arising from activities unrelated to the performance of his duties as a deputy sheriff, there was sufficient evidence to enable the jury to conclude that the defendant had participated with a city's mayor in a scheme to obtain bribes from a contractor in exchange for the award of a contract for work on the city's high school, that the defendant had solicited bribes from the contractor on behalf of the mayor, and that the defendant, as the mayor's agent, had received bribes from the contractor. [607-612]

At the trial of a deputy sheriff charged with violations of G. L. c. 268A, § 2 (*b*), as a result of his participation in a scheme with a city's mayor to obtain bribes from a contractor in exchange for the award of a contract for work on the city's high school, there was no error in the admission of evidence that the defendant had made loans to the sheriff of Suffolk County, where evidence that the defendant and the sheriff were friends and business associates and that the defendant made loans to the sheriff, coupled with evidence that both were on friendly terms with the mayor and were involved in the high school scheme, tended to show the likelihood of their participation in the criminal enterprise. [613-614]

At the trial of a deputy sheriff charged with violations of G. L. c. 268A, § 2 (*b*), arising from activities unrelated to the performance of his duties as a deputy sheriff, the defendant's relatively brief testimony on cross-examination as to unlawful use of an official vehicle, although improperly admitted, did not prejudice his substantive rights. [614]

At the trial of a deputy sheriff charged with violations of G. L. c. 268A, § 2 (*b*), arising from activities unrelated to the performance of his duties as a deputy sheriff, remarks by the prosecutor in which he referred to the defendant's oath of office and his position of trust as a court officer, although irrelevant and susceptible of confusion by the jury, were adequately treated in the judge's charge and did not require reversal of the defendant's convictions. [614-615]

At the trial of a defendant charged with violations of G. L. c. 268A, § 2 (*b*), arising from his alleged participation in a bribery scheme, certain improp-

erly admitted testimony concerning a second criminal enterprise, which did not involve the defendant, did not prejudice any of the defendant's substantive rights, given the brevity and nondamaging nature of this testimony and the judge's correct instructions to the jury on the theory of joint enterprise. [615-616]

A letter written by a prosecution witness a short time before his death, which occurred about one and one-half years following a defendant's conviction on charges arising out of a bribery scheme, did not exculpate the defendant so as to warrant granting him a new trial, where the letter lacked indicia of truthfulness, contained no detailed information explaining in what respects the witness had testified falsely at the defendant's trial, and gave no evidence of a truthful account of the witness's involvement in the scheme which would exculpate the defendant. [616-621]

INDICTMENTS found and returned in the Superior Court on December 2, 1976.

The cases were tried before *Roger J. Donahue,* J., and a motion for a new trial was heard by him.

After appeal was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Jack I. Zalkind* for the defendant.

*Judy G. Zeprun,* Assistant District Attorney (*Gerald Muldoon,* Assistant District Attorney, with her) for the Commonwealth.

LIACOS, J. In December, 1976, the defendant, Robert M. Tobin, and William G. Reinstein, the former mayor of Revere, were indicted for three violations of G. L. c. 268A, § 2 (*b*).[1] The indictments charged that Reinstein and Tobin solicited, agreed to receive, and received money from Simon Sharigian

---

[1] General Laws c. 268A, § 2 (*b*) and (*d*), as amended by St. 1964, c. 287, provide in relevant part: "Whoever, being a state, county or municipal employee . . . or a person selected to be such an employee . . . directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for . . . being influenced in his performance of any official act or any act within his official responsibility . . . shall be punished by a fine of not more than five thousand dollars or by imprisonment in the state prison for not more than three years or in a jail or house of correction for not more than two and one half years . . . ."

in return for Reinstein's being influenced in performing an official act.

On February 3, 1978, a jury convicted Tobin on all indictments, and he was sentenced to the Essex County house of correction for concurrent terms of two years on each indictment. Tobin timely filed an appeal. Later, he filed a motion for a new trial. The trial judge stayed both the appeal and action on the motion, pending the outcome of Reinstein's trial. A jury acquitted Reinstein of the bribery charges in February, 1982. Subsequently, Tobin pursued his motion for a new trial, which the judge denied on January 7, 1983. The appeal from the denial of the motion for new trial was consolidated with the appeal from the convictions. We transferred the appeals to this court on our own motion.

Tobin claims that the judge erred in denying his motion for a directed verdict, and in admitting irrelevant evidence which tended only to show the defendant's bad character and evidence of a separate criminal enterprise in which the defendant was not involved. We consider each of the defendant's allegations of error committed by the judge at trial and conclude that none warrants a reversal of the convictions. Tobin also contends that the judge erred in failing to grant his motion for a new trial, based on a purported posttrial recantation in a letter to the district attorney from Simon Sharigian, a key prosecution witness, and on the Commonwealth's failure timely to disclose this evidence. We conclude that the judge properly denied Tobin's motion for a new trial.

We note that the parties have stipulated that the transcripts of the cases against Reinstein and one David P. Borans are incorporated as part of this record. Borans, purchasing agent for the city of Revere at times relevant to this case, was convicted on indictments alleging a conflict of interest (six indictments) under G. L. c. 268A, § 2(b); larceny; accessory after the fact to a felony; perjury; and subornation of perjury. His convictions were affirmed. *Commonwealth* v. *Borans,* 379 Mass. 117 (1979). In *Borans,* we described the Commonwealth's theory in that case as being "that, from the outset of Mayor William Reinstein's administration, there existed two

schemes to compel contractors and vendors to make campaign contributions in exchange for public contracts. The first scheme sought a twenty-five thousand dollar kickback from Simon Sharigian, President of Si Associates, the contractor who was selected by the mayor to provide the specifications for the various categories of furnishings and interior equipment for the [new Revere] high school. The second scheme required Sharigian to solicit . . . contractors . . . interested in bidding for contracts . . . [and] to determine whether — and how much — these individual contractors would be willing to pay as a kickback to city officials in return for being awarded contracts with the city of Revere." *Id.* at 119-120. It is the first scheme which gave rise to the indictments against Tobin, the alleged agent or "bag man" for Reinstein, who allegedly collected a $25,000 kickback from Sharigian. The details of that transaction are set forth in *Borans* at 120-126 and need not be repeated here in detail.[2]

1. *Directed verdict.* Tobin claims that the judge erred in denying his motion for a directed verdict, since the Commonwealth failed to present sufficient evidence for the jury to infer that Tobin acted as the agent for Reinstein in the bribery scheme. In determining whether a trial judge properly submitted the charges against a defendant to the jury, "the test is 'whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient, as to each indictment, to permit the jury to infer the existence of the essential elements of the crime charged in that indictment.' " *Commonwealth* v. *Borans, supra* at 134, quoting *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975). Furthermore, the evidence and the inferences to be drawn therefrom must satisfy a rational trier of fact that

[2] We recognize, of course, that although the evidence as to Tobin's involvement in this scheme, as presented at the trial of Borans, was essentially the same as offered at Tobin's trial, we are limited, in ruling on Tobin's claims of error, to the evidence actually admitted against Tobin at his trial. Thus, we state the evidence at Tobin's trial on which we rely. Tobin, unlike Borans, was not an official of the city of Revere, and, as our discussion indicates, the Commonwealth was required (as it concedes) to prove that he was Reinstein's agent.

the defendant is guilty of each element of each offense beyond a reasonable doubt. See *Commonwealth v. Latimore*, 378 Mass. 671, 678 (1979). Accord *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979).

For a private individual to be convicted of an offense under G. L. c. 268A, § 2 (*b*), the evidence must show that the individual acted as the agent of a public official in an unlawful bribery scheme. See *Commonwealth* v. *Mannos*, 311 Mass. 94, 107-108 (1942) (convictions obtained under G. L. [Ter. Ed.] c. 268, § 8, former bribery statute). The Commonwealth also must prove that the defendant " 'participated in every essential step' of the felonious conduct." *Commonwealth* v. *Stasiun*, 349 Mass. 38, 46 (1965), quoting *Commonwealth* v. *Mannos, supra* at 110. A violation of G. L. c. 268A, § 2 (*b*), thus is established if there is sufficient evidence to show that the private individual acted as the agent or "bag man" for a public official who "corruptly . . . solicit[ed], . . . receive[d] or agree[d] to receive" something of value "in return for . . . being influenced in [the] performance of any official act." G. L. c. 268A, § 2 (*b*). See *Commonwealth* v. *Mannos, supra* at 107 (discussing similar elements of offense under predecessor bribery statute); *Commonwealth* v. *Dutney,* 4 Mass. App. Ct. 363, 375 (1976).

There was evidence that Robert Tobin and William Reinstein were friends in 1972. Tobin had done volunteer work on several of Reinstein's earlier campaigns and then worked in a quasi advisory position in the 1972 mayoral campaign in Revere. Tobin worked as a deputy sheriff in the Suffolk County sheriff's office in 1972. Sheriff Thomas Eisenstadt and Tobin had been friends for several years, and Eisenstadt and Reinstein were also social friends.

In 1972, Francis (Frank) Bowden worked as a management consultant and was especially knowledgeable about interior design work in public schools. Bowden and Tobin were close friends, as well as partners in several of their own business transactions. In the autumn of 1972, Eisenstadt met with Reinstein and Borans. Reinstein sought Eisenstadt's assistance to find a contractor for the interior design work on the high school.

In November, Tobin asked Bowden to attend a meeting at Eisenstadt's office. The sheriff told Bowden that he had a deal with Reinstein concerning the building of the Revere high school. When Eisenstadt offered him the project, Bowden declined; however, he told the sheriff that he might find an interested contractor. Eisenstadt asked Bowden how much someone would "throw back" on a $68,000 contract. Bowden thought 25% was a reasonable figure. The sheriff told Bowden that he would receive $5,000 for putting the deal together, and that he should get back to Tobin on this matter.

Bowden then talked to Sharigian. Bowden explained to Sharigian that if he wanted the Revere job he would have to throw back at least 25% of the contract price. Bowden told Sharigian that he would be reached by Robert Tobin, a deputy sheriff for Suffolk County, who was involved in the deal. Bowden then told Tobin that Sharigian was interested in the job. Subsequently, Tobin called Sharigian, and the two men met at the sheriff's office. Tobin told Sharigian that he represented "people in the Mayor's office" in Revere, and that he had a contract for the interior design of the high school. Tobin said that "they were having problems with the [previous] architect," and that another prospective designer said that he could throw back "somewhere in the area of ten thousand" on the contract. Tobin asked Sharigian "how much [could he] do the job for." Sharigian replied, "somewhere in the area of forty thousand." Tobin said that was "[f]ine," and that this amount should be largely a cash payment.

Sharigian next saw Tobin at the sheriff's office in late November, 1972. Sharigian submitted his résumé and letter of intent addressed to David Borans, as Tobin had requested. Tobin handed Sharigian the contracts for the Revere high school job and told him to sign them and return them quickly. Sharigian told his associate, Paul Martel, that he "had obtained the [Revere high school] contracts," and that the deal involved "a forty-thousand-dollar throwback." After discussing the matter, Sharigian and Martel agreed that they would throw back only $25,000. Sharigian called Bowden to report that "everything had worked out okay." Subsequently, Sharigian returned the signed contracts to Tobin.

The Commonwealth presented sufficient evidence of a criminal joint enterprise comprised of Reinstein, Borans, Eisenstadt, and Tobin,[3] the purpose of which was to solicit and obtain kickbacks from Sharigian in return for his being awarded the Revere high school contract. Relevant and corroborative background evidence of the bribery scheme initiated by Reinstein involving the kickbacks on the high school contract came from other witnesses.

Bowden's testimony constituted strong circumstantial evidence of Tobin's participation in the solicitation phase of the joint enterprise. Tobin involved Bowden in the "deal" which Eisenstadt "had . . . with the Mayor of Revere" concerning the building of the high school. Bowden and Sharigian testified that Sharigian was told that "he would have to give up twenty-five percent of the job and possibly more" to obtain the Revere contract, and that Sharigian would have to "get together with Bob Tobin."

Sharigian's testimony supported the inference that a joint enterprise existed which originated with the mayor's office in Revere, and that the objective of this enterprise was to obtain kickbacks from Sharigian. Tobin told Sharigian that he "represent[ed] the people in the Mayor's office" and he delivered the Revere high school contract to Sharigian directly.

Sharigian also testified that Tobin told him to submit invoices to Revere city hall because he was "entitled to additional money" for work on the high school. Subsequently, Sharigian submitted $20,000 worth of invoices for which he was compensated by the city of Revere, although he had performed no substantive work on the project.

Finally, there was strong circumstantial evidence of Reinstein's knowledge of, and control over, the kickback scheme. At a restaurant meeting with Sharigian, Reinstein appeared to know that Sharigian was referring to Tobin when Sharigian said that he "made a deal with your man for $40,000 [which] was cut down to 25." Reinstein merely asked who this Frank

---

[3] There was also evidence that Ron Paone, clerk of the works for the Revere project, also was involved in this joint venture.

Bowden was who had received $17,000 of the money, and told Sharigian that "[f]rom here on" he should deal directly with the people in his office.[4] Furthermore, there was evidence that Paone talked to Sharigian, seeking to satisfy the $2,000 balance of the throwback which "the Mayor . . . was quite anxious to get."[5] Sharigian also testified as to admissions by Tobin of his involvement in the kickback scheme that originated in the mayor's office.[6] The factual scenario presented by the Commonwealth's evidence was not rebutted except by Tobin's uncorroborated testimony.

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that a rational trier of fact could have inferred that Tobin participated in a criminal enterprise originated by Mayor Reinstein for the purpose of soliciting money from Sharigian in exchange for awarding him the Revere high school contract. See *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 54 (1975). Although the evidence is largely circumstantial, the crucial witnesses, including Sharigian, Martel, and Bowden, consistently corroborated each other's testimony concerning the sequence and substance of the incidents which incriminated Reinstein and Tobin in the kickback scheme. This evidence, combined with evidence of Tobin's consciousness

---

[4] Reinstein told Sharigian to deal either with Borans or Paone. Also in January, 1973, Sharigian was asked to attend two meetings with Reinstein and his colleagues at Revere city hall. At one of these meetings, Reinstein told Sharigian that they were "desperately in need of campaign funds" for the upcoming elections. He asked Sharigian at length about the normal percentages that get thrown back on vendors' contracts. Sharigian told him that he would try to arrange a solicitation program whereby vendors would throw back money into the mayor's campaign fund. Reinstein said he would appreciate that.

[5] Sharigian paid $17,000 to Frank Bowden and $3,000 to Jack D. Stone, who allegedly did consulting work for Si Associates. Both payments were by check. No such work was done. Bowden gave $12,000 to Tobin; Stone gave $3,000 to Borans. Sharigian also gave Tobin $3,000 in cash, but claimed that he had paid $5,000. There was evidence that Reinstein had received $3,000 and expected $2,000 more. There also was evidence that Reinstein had not realized that a total of $25,000 had been demanded of Sharigian by Tobin, thinking only a lesser amount was involved.

[6] Further supporting the Commonwealth's case was documentary evidence of the phony invoices and the checks issued to Jack Stone and Frank Bowden.

of guilt, "form[ed] a fabric of proof that was sufficient to warrant the jury's finding" that Tobin, as Reinstein's "bag man," was guilty of soliciting the bribe from Sharigian. *Commonwealth* v. *Rojas,* 388 Mass. 626, 629, 630 (1983).

There was also circumstantial, and virtually unrebutted, evidence presented by the Commonwealth which could have satisfied a jury that Tobin, acting as Reinstein's agent, agreed to receive, and received, kickbacks on the Revere contract for Reinstein. Sharigian and Martel testified that the mayor knew about the $3,000 Stone check and the $5,000 cash commitment procured by Tobin. Martel, Bowden, Sharigian, and Stone also offered further relevant testimony concerning Reinstein's expectation and receipt of the payments from Sharigian. There was evidence that Borans told Martel that Reinstein expected only "eight to ten thousand dollars and that he had only got about three thousand dollars in cash." At the time of this conversation, Sharigian had already given Tobin the $3,000 cash payment.

The Commonwealth also presented sufficient evidence implicating Tobin as Reinstein's "bag man" in receiving and "agreeing to receive" the monies from Sharigian. Sharigian and Martel testified that Tobin instructed Sharigian to issue a check to Jack D. Stone for $3,000, and also requested him to deliver $5,000 in cash.

There was also evidence that Tobin called Sharigian in April, 1973, asking about the $5,000 which was outstanding on the deal, and that in early May, 1973, Sharigian delivered $3,000 in cash to Tobin in partial fulfilment of the cash obligation. Bowden, Stone, Martel, and Sharigian also indicated that Reinstein ultimately obtained some of these funds. Thus, the Commonwealth's circumstantial evidence was sufficient to enable a jury reasonably to infer both an agreement to receive and the receipt of bribery monies by Tobin on behalf of Reinstein. See *Commonwealth* v. *Montecalvo, supra*; G. L. c. 268A, § 2 (*b*). Cf. *Commonwealth* v. *Connolly,* 308 Mass. 481, 489-490 (1941) (public official's violation of bribery statute shown by proof of request or acceptance of gratuity, either directly or through an agent or "bag man"). We conclude that the judge correctly denied Tobin's motion for a directed verdict.

2. *Evidentiary rulings*. a. *Character evidence*. The defendant contends that the judge's admission of allegedly irrelevant evidence offered to show the defendant's character as a bad person constituted reversible error. Specifically, the defendant claims that error resulted from the admission of testimony discussing loans of money made by Tobin to Eisenstadt, Eisenstadt's financial dealings, and Eisenstadt's use of a vehicle leased for use by deputy sheriffs. The defendant contends that this improperly admitted evidence, combined with the prosecutor's repeated references to the defendant's alleged violations of his position of public trust, warranted reversal.

We have defined relevant evidence as that evidence which has a "rational tendency to prove an issue in the case." *Commonwealth* v. *LaCorte,* 373 Mass. 700, 702 (1977). Evidence need not establish directly the proposition sought; it must only provide a link in the chain of proof. *Commonwealth* v. *Drayton,* 386 Mass. 39, 48 (1982). P.J. Liacos, Massachusetts Evidence 408 (5th ed. 1981). We accord the judge substantial discretion in deciding whether evidence is relevant, and whether the prejudicial implications of such evidence outweigh its probative value. *Commonwealth* v. *Booker,* 386 Mass. 466, 469-470 (1982). We have also stated that "while evidence of other . . . wrongful behavior may not be admitted to prove the character or propensity of the accused as enhancing the probability that he committed the offence . . . it is admissible for other relevant probative purposes." *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973).

Evidence that Tobin and Eisenstadt were friends and business associates, and that Tobin made monetary loans to Eisenstadt, coupled with evidence that both Eisenstadt and Tobin were very friendly with Reinstein and were involved in the high school scheme, tended to show the likelihood that the two men would be working together with Reinstein in the criminal enterprise. It is doubtful whether testimony of loans made from Tobin to Eisenstadt amount to evidence of "wrongful" acts which could unfairly prejudice the defendant. Cf. *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978) (witness alluded to defendant's involvement in robbery). Furthermore, the harm-

ful effects, if any, of admitting such evidence were offset by the judge's instruction to the jury that they were to consider the evidence only "in regard to whatever relationship [they found] existed between the defendant and . . . Eisenstadt." See *Commonwealth* v. *Chalifoux, supra* at 816. Thus, the admission of this evidence was not error.

On cross-examination, Tobin admitted that he had leased an automobile, as deputy sheriff, and signed Eisenstadt's name as lessee. Although the automobile primarily was used by deputy sheriffs for making civil arrests, Tobin stated that Eisenstadt and his wife occasionally used it. This was evidence of a prior wrongful act, since it showed that Tobin and Eisenstadt both could have violated a statute prohibiting the sheriff from receiving any financial benefit from the deputy sheriffs' division. We think that the judge incorrectly ruled that such evidence of a previous wrongful act was admissible as within the scope of cross-examination and was relevant to the offenses with which Tobin was charged. See *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 755 (1961); *Chalifoux, supra.* However, the testimony concerning the automobile lease was extremely brief. Given the Commonwealth's massive amount of evidence which inculpated Tobin and the judge's proper instructions on the indictments, we think that the incorrect admission did not prejudice any substantive rights of the defendant. See *Commonwealth* v. *Shea,* 323 Mass. 406, 415 (1948).

b. *Remarks by the prosecutor.* The defendant contends that remarks made by the prosecutor in his opening and closing statements warrant reversal. The defendant claims that the prosecutor's reading of Tobin's oath of office as a court officer, and his references to Tobin's purported violations of his political position of trust, were irrelevant to the charges in this case and susceptible of confusion by the jury. These remarks well may have been beyond the prosecutor's right, but the judge removed any doubt as to the import of these remarks by immediately instructing the jury that Tobin was charged with participating in an alleged bribery scheme, and that his official duties as a court officer were not issues in this case. The remedial effect of the judge's instruction adequately protected

the defendant, and thus the prosecutor's remarks do not justify reversal. See *Commonwealth* v. *Roberts,* 378 Mass. 116, 128 (1979).

c. *Evidence of a separate criminal enterprise.* At trial, the defendant objected to the admission of Martel's testimony concerning a meeting among Martel, Reinstein, and Paone at which they discussed the amount of campaign contributions solicited from furnishing and equipment subcontractors on the Revere high school project.[7] The prosecutor agreed with defense counsel that Tobin was not involved in this enterprise. The prosecutor maintained, however, that this evidence was relevant to Reinstein's state of mind and thus to the joint enterprise between Reinstein and other Revere officials in which the defendant was involved. The defendant claims that he was unduly prejudiced by the evidence of this separate enterprise which was unrelated to the solicitation of Sharigian.

As the prosecutor admitted, Tobin had no involvement in the alleged second venture comprised of Reinstein, Martel, Paone, and Sharigian, which sought to solicit monies from equipment subcontractors on the high school project. The latter enterprise appeared to be totally unrelated to, and independent of, the initial venture to obtain monies from Sharigian. Evidence of Reinstein's participation in this combination did nothing to prove either the purpose or the course of operations of the Sharigian enterprise in which Tobin was involved. See *Commonwealth* v. *Pleasant,* 366 Mass. 100, 103-104 (1974). Cf. *Commonwealth* v. *Clancy,* 187 Mass. 191, 195-196 (1905) (evidence of separate transactions in which defendants sold overvalued businesses properly admitted since probative of one conspiracy). Moreover, evidence of the relationship between Reinstein and the other participants in the second enterprise was not relevant to their involvement in the earlier and com-

---

[7] The defendant also objected to Sharigian's testimony describing Paone's job as clerk of the works in Revere as, in part, helping to solicit and obtain "moneys" from persons "not cooperating" in this regard. Sharigian did not explain further how, or from whom, Paone solicited monies. We conclude that this evidence, albeit possibly irrelevant to the joint venture in which Tobin was involved, on its face was not damaging to the defendant.

pletely separate scheme involving Tobin. Cf. *Commonwealth v. Stuart,* 207 Mass. 563, 568 (1911) (evidence of coventurer's business relationship with defendant admissible to show scope and character of conspiracy in which both involved). The judge therefore improperly admitted the evidence concerning the second enterprise.

Martel's testimony concerning the second venture was very brief and did not implicate Tobin, nor even mention his name. The evidence, on its face, is not damaging to the defendant and comprised only a miniscule part of the evidence presented by the Commonwealth. The judge twice gave correct instructions to the jury, early in the Commonwealth's case and during his charge, on the theory of joint enterprise. The judge properly informed the jury that, in order to consider a declaration by a coventurer against the defendant, the jury must find that a criminal enterprise had been formed, that the defendant had joined it, and that the statement was made during the pendency of the enterprise and in furtherance of it. Given the brevity and the nondamaging nature of the inadmissible statements, as well as the judge's correct instructions on joint enterprise, we conclude that the improper admission did not prejudice any substantive rights of the defendant, and thus does not warrant reversal. See *Commonwealth* v. *Beckett,* 373 Mass. 329, 340-341 (1977). Cf. *Commonwealth* v. *White,* 370 Mass. 703, 714 (1976) (judge's improper admission of coventurer's statements justified reversal where declarations ran through case, patently incriminated defendant, and coventurer unavailable to testify). There was no reversible error.

3. *Motion for a new trial.* Tobin based his motion for a new trial on a letter written by Simon Sharigian to the district attorney for the Suffolk District dated June 25, 1979, and received by the office of the district attorney on July 5, 1979. Tobin contended that Sharigian's letter was exculpatory, since it stated that Sharigian was coerced into cooperating with the office of the district attorney in testifying against Reinstein at earlier trials,[8] and that he believed that the mayor was innocent

_____

[8] Sharigian had been the key government witness in two trials on indictments of Reinstein. Both ended in a mistrial. A third trial of Reinstein, fol-

of all bribery charges. Tobin further claimed that the Commonwealth's failure to apprise defense counsel of the letter until almost two months after the Commonwealth received it, denied Tobin the opportunity to interview Sharigian prior to his death.

At the time Sharigian wrote the letter, he was extremely ill with cancer and was receiving chemotherapy. Tobin's counsel became aware of the letter on, or about, August 23, 1979, as a result of a television news broadcast. On August 27, 1979, the Commonwealth gave actual notice of the letter to defense counsel and allowed them to inspect the document.[9] Sharigian died on August 30, 1979. Between the time that the office of the district attorney received the letter and the date of Sharigian's death, neither the Commonwealth nor the defendant spoke to Sharigian.

In pertinent part, Sharigian's letter requested that the district attorney excuse him from testifying at Reinstein's upcoming trial. Sharigian said that he was "not only sick in body but . . . in mind and heart over this past trial [Reinstein's trial] and upcoming trial." Sharigian said that he told the assistant district attorney in Tobin's case that he (Sharigian) "never gave Mayor Reinstein one cent and never saw anyone else give him anything." Sharigian further wrote that "it is [his] sincere belief that Mayor Reinstein is completely innocent of these charges."

Sharigian also stated that he "suspected" that Reinstein's prosecution was politically motivated by persons who sought to remove him from office and to substitute a mayor of their choice. Sharigian wrote that he had to cooperate with them since they "threaten[ed] me with prison and my family with disgrace."[10]

On December 2, 1982, the judge who presided at Tobin's trial heard evidence and arguments from counsel on this motion.

lowing Sharigian's death, resulted in findings of not guilty. The letter was received between the second and third trial, and after the convictions of Borans and Tobin.

[9] Copies of the original letter were given to defense counsel on September 11, 1979, following the defendant's motion for production of documents.

[10] Sharigian also stated that he was under a doctor's care during the duration of his cancer treatments, which he said would continue until December, 1979. He also wrote that he was regularly seeing a psychiatrist.

Sharigian's doctor testified that in May and June, 1979, Sharigian was aware of the terminal nature of his cancer and was very rational and interested in his condition, although depressed at times. During June, Sharigian was experiencing abdominal pain, nausea, and had lost sixteen pounds. The doctor stated, however, that Sharigian probably could have had a lawyer interview him in his home up until the end of July.

The defendant contends that the judge erred in failing to grant his motion for a new trial, based on Sharigian's purported recantation. Tobin maintains that the judge should have accepted Sharigian's statements in his letter as a dying declaration. Alternatively, the judge should have believed the truth of the statements, since they were made when Sharigian knew that his death was imminent, and the letter reflected a desire by him to clear his conscience. In any event, the defendant claims that, given the failure of the prosecution timely to disclose Sharigian's letter, the Commonwealth should be estopped from denying its truthfulness. The Commonwealth contends that the letter was not exculpatory as to Tobin, and, moreover, it had no duty to disclose evidence which came into its possession after the defendant was convicted. Thus, the Commonwealth claims that the judge properly denied the defendant's motion for a new trial.

A judge of the Superior Court may grant a new trial "if it appears . . . that justice may not have been done." Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). When a defendant seeks a new trial based on an alleged recantation by a material witness, " 'the duty of the trial judge is to give grave consideration to the credibility of the witness's new testimony' and . . . 'the motion is addressed to [the trial judge's] sound judicial discretion.' " *Commonwealth* v. *Cassesso,* 360 Mass. 570, 575 (1971), vacated and remanded on other grounds sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972), quoting *Commonwealth* v. *Robertson,* 357 Mass. 559, 562 (1970). "The possibility that the recantation or newly discovered evidence might affect the result of the trial does not necessarily require the granting of a new trial." *Commonwealth* v. *Robertson, supra.* When the judge is not presented with any testimony or

an affidavit by the allegedly recanting witness, or where the witness fails to detail the substance of his previously false testimony and the particulars of the new evidence that he would give exculpating the defendant, the trial judge correctly may deny the defendant's motion for a new trial. See *Commonwealth* v. *Watson,* 377 Mass. 814, 838-839 (1979); *Commonwealth* v. *Cassesso, supra* at 576, 578-579. Cf. *Commonwealth* v. *Ellison,* 376 Mass. 1, 19-20 (1978) (circumstantial evidence gave strong support to sworn recantation of key witnesses exculpating defendant). We will not reverse the judge's denial of "a motion for a new trial . . . [based on] newly discovered evidence . . . unless a survey of the whole case shows that his decision, unless reversed, will result in manifest injustice." *Commonwealth* v. *Robertson, supra* at 562, quoting *Sharpe, petitioner,* 322 Mass. 441, 445 (1948). See *Commonwealth* v. *Watson, supra* at 839.

We think that the judge's finding that Sharigian's trial testimony was consistent with statements in the letter that he never gave Reinstein any money and he never saw anyone else give him money is not dispositive. Although Sharigian testified that he never personally observed the mayor accept any money as part of a bribe for the Revere high school job, he also testified extensively about his personal knowledge of the kickback scheme originating in the Revere city hall. Sharigian's letter, taken as a whole, appears on its face to conflict with the substance of his trial testimony. Thus, we consider whether the statements in the letter amount to a recantation of his trial testimony.[11] We agree with the judge's conclusion that Shari-

---

[11] If Sharigian's letter is a recantation of his testimony incriminating Reinstein, under the joint enterprise theory necessarily employed with respect to bribery charges against a defendant who is not a public official, the recantation is also exculpatory as to Tobin. See G. L. c. 268A, § 2 (*b*).

We dismiss summarily the defendant's contention that Sharigian's letter should have been regarded by the judge as a dying declaration and thus accepted for the truth of its statements. This case does not meet any of the prerequisites necessary for establishing such an exception to the hearsay rule. See *Commonwealth* v. *Dunker,* 363 Mass. 792, 794 (1973); P.J. Liacos, Massachusetts Evidence 326-327 (5th ed. 1981). We note also that the judge found that Sharigian, at the time of writing the letter, did not

gian's letter was not exculpatory as to Reinstein or Tobin.[12] Sharigian's letter, which is neither a sworn statement nor testimony given under oath, does not itself carry indicia of truthfulness. See *Commonwealth* v. *Gwizdoski,* 284 Mass. 578, 581 (1933). Moreover, the letter is devoid of detailed information explaining in what respect Sharigian testified falsely in Tobin's trial and in the previous trials. Also completely absent from the letter is evidence of a truthful account of Sharigian's involvement in the Revere high school project which would exculpate Reinstein and Tobin.

By contrast, Sharigian had testified extensively and was cross-examined at the trials of Borans and Tobin. Our review of the evidence presented at Tobin's trial supports strongly the judge's conclusion that Sharigian testified truthfully concerning Reinstein's involvement in the bribery scheme.[13]

---

have a contemplation of death since he anticipated continuing cancer treatments until December, 1979.

The defendant's estoppel argument, viz., that the judge was required to accept the truth of the entire letter because of the district attorney's failure to promptly disclose it to the defendant's lawyer, is novel but unpersuasive. The authorities that the defendant cites to support his argument as to estoppel are wholly inapposite to the facts of this case.

[12] In support of this conclusion, the judge noted that Sharigian previously testified for the Commonwealth at the Tobin and Borans trials, as well as at Reinstein's first aborted trial. He noted that, at Reinstein's later trial, although the former mayor was acquitted, there was sufficient evidence on the bribery charges for the case to reach the jury. The judge found that Tobin's case could have been tried without Sharigian's testimony. The fact that separate juries reach differing results as to codefendants does not, by itself, warrant the allowance of a motion for new trial. See *Commonwealth* v. *Pisa,* 372 Mass. 590, 597 (1977).

The judge considered Sharigian's statements in the letter professing his belief in Reinstein's innocence to be irrelevant. The issue of Reinstein's innocence, the judge reasoned, was not a question for Sharigian, but for a jury to decide. The judge decided that the jury in Tobin's case decided this issue ably, based on the testimony of several witnesses other than Sharigian.

The judge also did not believe Sharigian's allegations that political forces were behind the charges against Reinstein. Evidence at the trials of Tobin, Borans, and Reinstein clearly indicated that the Revere city council, with Reinstein participating, approved the investigation into the high school project conducted by the office of the district attorney.

[13] The Commonwealth noted, in further support of the conclusion that the letter was not exculpatory of Tobin, that Sharigian chose not to write

Much of the evidence which implicated Reinstein in the bribery venture came from witnesses other than Sharigian and consisted of testimony independent of, or in corroboration of, Sharigian's testimony. Tobin's testimony at trial was the only significant evidence which conflicted with the wealth of corroborated testimony implicating Reinstein and Tobin in the kickback scheme. Based on the Commonwealth's evidence, a reasonable jury could infer that Reinstein used Tobin as his "bagman" to solicit and to obtain kickbacks on the Revere high school contract.

Sharigian's letter did not rebut any of this detailed evidence inculpating Reinstein and Tobin in the bribery scheme. The letter thus does not present factual allegations which would tend to support a recantation.[14] Therefore, we conclude that Sharigian's letter, considered in conjunction with a review of all the relevant evidence, does not exculpate the defendant so as to warrant the granting of a new trial. Having so concluded, we need not address the argument of the defendant that the district attorney erred in failing to make prompt disclosure of this letter. The judge correctly denied the motion, based on the claim of the alleged recantation.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

the letter until one and one-half years after Tobin's trial and also did not include Tobin's name in the letter.

[14] The judge's finding that Sharigian wrote the letter in an attempt to avoid testifying at Reinstein's trial appears more plausible. Sharigian expressed his desire to be excused as a witness in the first line of his letter. He also mentioned that he was under a physician's care for his cancer treatment and that he was seeing a psychiatrist. Furthermore, Sharigian's doctor testified that Sharigian felt ill at the time the letter was written in late June, 1979, being debilitated by the progression of his cancer.