COMMONWEALTH *vs.* WILLIAM MURRAY.

No. 88-P-631.

Suffolk.  September 12, 1989. — October 31, 1989.

Present: ARMSTRONG, KAPLAN, & KASS, JJ.

*Practice, Criminal,* Conduct of prosecutor, Argument by prosecutor, Judicial discretion. *Evidence,* Relevancy and materiality.

At the trial of indictments for rape, assault and battery, and kidnapping, the judge did not err in admitting testimony that the defendant had a garter belt hanging from the rear view mirror of the car he drove, where this testimony was relevant to the identity of the car in which the victim had ridden on the night of the crimes. [876-877]

Closing argument by the prosecutor at a rape trial, attempting to raise an insinuation that the defendant had something to explain, although regrettable, presented no substantial risk of a miscarriage of justice. [877]

In the circumstances of a rape trial, the prosecutor's reference during closing argument to certain testimony he had elicited, concerning the victim's character and her family's apparent rectitude, caused no risk of a miscarriage of justice. [877-878]

INDICTMENTS found and returned in the Superior Court Department on April 18, 1986.

The cases were tried before *John L. Murphy, Jr., J.*

*Richard Zorza,* Committee for Public Counsel Services, for the defendant.

*Sharon B. Soffer,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.  We affirm convictions of the defendant William Murray of the crimes of rape (by natural and unnatural means) of a child under the age of sixteen, assault and battery, and kidnapping.[1] Certain tactics of the prosecutor at trial are open to

---

[1] For the rape, the judge sentenced the defendant to six to eight years imprisonment at M.C.I., Cedar Junction, and for the assault to three to five years (concurrent). The kidnapping conviction was placed on file by consent. Upon the defendant's appeal to the Appellate Division of the Superior Court, the sentence for rape was increased to nine to twelve years.

criticism, but we conclude that the indiscretions were not so grave as to impair the basic fairness of the trial, whose results were well supported by the evidence.

1. *Facts.* The jury, basing themselves on the victim's account of the criminal events, supplemented by the "fresh complaint" and other testimony offered by the Commonwealth, could take the facts to have been as follows.

On the evening of Sunday, January 26, 1986, the date of the Patriots-Chicago Bears Super Bowl game, Sean Smith, aged 21, and his brother (23) gave a party at their house at 22 Patton Avenue, Jamaica Plain. About forty people attended, most of them in their early twenties. Only three teenagers appeared, the victim, Amy, and her friends Karen and Marcia (all pseudonyms), and of these Amy was the youngest, aged fifteen. The three spoke and laughed with the defendant (23), a subject of the gaiety being his wager of $150 on the Patriots. Beer in kegs was supplied; some guests brought their own drinks; and there was a hint of the smell of marihuana. Amy had perhaps three cups of beer after her arrival around 7:30 P.M. The defendant had been drinking; his condition was described variously as "well to do," "there all day," "the glare in his eye," "buzzed," but he was in control.

As the next day was a school day, Amy was under a family curfew of 9:30 P.M. About that time she sought a ride home.[2] Sean was not available for the purpose. The defendant volunteered. Amy was nervous about riding alone with the defendant — she had known him only slightly — but neither Karen nor Marcia was willing to leave the party. So Amy and the defendant proceeded to the defendant's car.

The defendant drove down Hyde Park Avenue in the general direction of Amy's home on Maynard Street, Roslindale. At Blakemore Street he took a right — Amy thought this might be a shortcut home — but then he went on to his house at 55 Johnswood Street, Roslindale. Amy complained here (and repeatedly later) about having to go home. The defendant entered

---

[2] Amy and her friends had been driven to the party by Karen's mother; they (or at least Amy) were evidently expected to pick up rides home.

his house, remained there several minutes, and returned carrying a white sheet — Amy could not quite make out what it was, as the defendant, entering the car, tucked it in at the left side of his driver's seat.

Now the journey led to Roslindale Square, up Roberts Street, then on Walter Street and on Center Street to West Roxbury and the Faulkner Hospital. There the defendant drove left all the way down Allendale Street, then with a few turns came to rest on a dirt road in the vicinity of the "Gloria" statue (Allendale Farm). In this dark place, the defendant offered Amy a beer, then asked for a kiss; she refused both. He had a beer. The time was now perhaps 10:15.

After some difficulty in getting traction in the dirt (apparently it was raining or rainy that evening), the defendant drove on West Roxbury Parkway to a dark wooded area behind Bellview Towers near Bellview Hill Road. He would take her home, he said, if she gave him a kiss that was good enough. She gave him "a little like peck": not good enough. She tried to get out of the car but there was a lock down on the door. At this point a police officer or security guard came to the car, flashed his light inside, and told them to move.[3] The defendant drove back to his house and parked across the street from it.

The defendant commenced to force himself on top of her. As she struggled against him and screamed, he said he would kill her if she didn't shut up. He began strangling her. She passed out. Next, gagging, she found herself being carried slung over the defendant's shoulder. They reached a dark garage nearby.

He put her down on the floor of the garage and, with threats to kill her or to tie her up and leave her there, he drew down her pants and underwear and performed cunnilingus upon her. Then he — now naked from the waist down — attempted to press his penis into her vagina, but even with her coerced help he succeeded only slightly. After removing her upper clothes, and fondling her, he demanded, under threat of forcing her

---

[3] Asked why she had not said anything to the guard, she said: "I was scared, and nothing was really done to me at, you know, no act was really against me then."

anally, that she perform fellatio upon him, and she did so. At no stage did the defendant ejaculate.

At length they put on their clothes. Amy could not find her underwear, and recovered from the floor only one shoe.[4] The defendant said, reflectively, "he was going to be put in jail for this 'cause my [Amy's] father was a cop." To cajole him she said, "I knew that he had problems and, you know, that he was a good kid and stuff, and I said I wouldn't tell my father or anybody." He returned to his house, then drove her home, arriving about 12:05 A.M. He left. Entering the house, Amy told her father (later joined by her mother[5]) that she had been raped. She was dishevelled, dirty, and bewildered and distraught. She was persuaded not to take a shower so that evidence might be preserved.

Her parents brought her to Faulkner Hospital and then to Beth Israel Hospital which was better equipped for such cases. A rape kit was prepared. No acid phosphatase (associated with semen) was recovered. Combings of pubic hair yielded no foreign hair but recovered particles of dirt and leaves. There were red marks at the patient's throat, abrasions on her interior neck and her back and right wrist, and superficial abrasions on her left front thigh. Articles of her clothing, surrendered to the police, were intact but soiled. Detective Marie Donahue of the Boston police, inspecting the dirty, leaf-strewn concrete floor of the abandoned garage on the morning of January 27, found there a white sheet or bedspread. Amy had a recollection of such a sheet being on the garage floor when she was raped.

To conclude: Amy's comprehensive testimony of what had happened to her was consecutive and coherent, was not weakened by cross-examination, and was rounded out by other testimony. To the contrary, the defendant, the sole witness for his defense, told a story that appeared implausible and suffered on cross-examination. He did not deny that he was with Amy

---

[4] The other shoe she found wedged in the car, a result of the struggle there.

[5] Her mother had become alarmed about Amy's absence and got through to her husband, who went off duty and came home. She then went to inquire at the house of a young man, Amy's friend, who, she supposed, attended the party.

from the time of departure from the party to arrival at her house, but he suggested that Amy had been unwilling to go home or to return to the party, and that, not knowing what he should do, he drove about with her rather aimlessly, and without indulging in so much as a kiss.

2. *Prosecutor's actions.* (a) Marcia, testifying in direct examination about the party,[6] said she knew the kind of car the defendant drove, and that car was parked that night in front of Sean's house. It was "a big, big car, four-door, it was like a Chevy kind of thing." Q. "Was there any decorations around this car that you knew of?" A. "Yeah, he had a garter belt hanging from a mirror of the car." She said it was on the rear view mirror, on the windshield. Defense counsel then said, "I object, it's irrelevant." The objection was overruled.

Karen, testifying the next day, was also asked whether there was anything about the car that helped her to identify it, and she gave a similar answer about a garter. A defense objection was overruled. On cross-examination of Karen, counsel himself reverted to this testimony. He said she had mentioned something about a garter; had anyone suggested that she mention the garter? A. "No, it's on there. It's the first thing you noticed." Counsel then asked about its color (light blue) and where it was placed (on the rear view mirror).

The prosecutor had reason to fix the identity of the car that Amy entered when she left the party: the line that the defendant's defense would take was not then clear; there was no concession about a journey in the defendant's car from 9:30 onward. Contrast *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 468-469 (1985). And see *Commonwealth* v. *Rancourt*, 399 Mass. 269, 276 n.9 (1987). At that stage the judge could not be faulted for finding relevance. Although the point was not raised, he might have considered, and perhaps did consider, the question of a warning instruction (for the answers had already been given before objection) to obviate possible suggestiveness or prejudice, but that would lie in discretion. See *Com-*

---

[6] Marcia also testified to Amy's fresh complaint, as did Karen, Amy's father, Detective Donahue, and Lori Bennett (nurse at Beth Israel).

*monwealth* v. *Watkins*, 375 Mass. 472, 491 (1978); *Commonwealth* v. *Chasson*, 383 Mass. 183, 187 (1981); *Commonwealth* v. *Booker*, 386 Mass. 466, 469 (1982); *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984). No doubt the prosecutor would have been better advised to contrive to avoid injecting a garter. However, the testimony seems trivial even after defense counsel chose to fish in it on cross-examination.

The prosecutor was again incautious, or worse, in a passage of his closing speech where he used the testimony to raise an insinuation that the defendant was a raunchy fellow who had something to explain: "She wanted to be with you, Mr. Murray, the man with the garter belt hanging on his car. Whatever that was supposed to be a badge or a symbol of was never explained." The defense took no objection. The prosecutor's remark is regrettable, but this case seems to us distant from the instances of prosecutorial overreaching upon which the defense seeks now to rely for a reversal;[7] and in the light of the entire record we believe there is scant basis for a reversal even if a milder standard is applied than the one appropriate in the absence of defense objection — "substantial risk of a miscarriage of justice." See *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967); *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978).

(b) The defense was asking the jury to believe that Amy's story was self-invented, a fabrication perhaps to save herself from parental wrath for having exceeded the curfew by two and a half hours. This theory was made express in defense counsel's closing speech. It was foreshadowed during the cross-examination of Amy by questions whether anyone had, in effect, assisted her in the deception by going over her testimony with her or suggesting what she should testify to. The prosecutor on his part asked Marcia and Karen whether Amy had been a truth-telling friend, and asked Amy's father what kind of a child she had been. In closing, the prosecutor pointed to these estimates and to the apparent rectitude of Amy's family. There

---

[7] Such cases as *Commonwealth* v. *Clary*, 388 Mass. 583 (1983), *Commonwealth* v. *Kozec*, 399 Mass. 514 (1987), and *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465 (1985).

is complaint that, if Amy's character was indeed put in question, rehabilitation should have been by proof of her reputation, not by witnesses' opinions of her. See Liacos, Massachusetts Evidence 166-168 (5th ed. 1981). But no objection was taken to any of this, and it bespeaks a low opinion of the jury to suppose that they could be misled into unjust verdicts by this expectedly pious kind of testimony.[8]

*Judgments affirmed.*

---

[8] We note that the judge instructed the jury that closing argument was not evidence and also dealt with the jury's assessment of credibility. See the discussion in *Commonwealth* v. *Kozec*, 399 Mass. 514, 517-518 (1987).