SIDNEY BINDER, INC., & another[1] *vs.* JEWELERS MUTUAL
INSURANCE COMPANY, INC.

No. 88-P-653.

Suffolk. December 11, 1989. - April 9, 1990.

Present: WARNER, C.J., KASS, & FINE, JJ.

*Insurance*, Theft insurance. *Contract*, Insurance. *Evidence*, Relevancy and
    materiality, Motive, Hearsay, Business record. *Corporation*, Corporate
    entity. *Consumer Protection Act*, Availability of remedy, Businessman's
    claim, Insurance. *Practice, Civil*, Consumer protection case, Findings
    by judge.

At the trial of an action brought by a corporation and an individual who
    was its principal officer, the judge properly admitted evidence of the
    individual plaintiff's financial relationships with another corporation
    that was relevant to whether the alleged theft had been arranged by
    that plaintiff. [461-463]
A party in a civil action could not properly raise on appeal a ground for
    objection to certain relevant evidence, where the objection at trial had
    not been made on that ground. [463-464]
At the time of an action seeking recovery under a theft insurance policy,
    the evidence was sufficient to warrant the jury in finding that an appar-
    ent theft of jewelry had been arranged by the individual plaintiff. [464-
    465]
An insurance company, notwithstanding that it is a closely regulated busi-
    ness, is entitled to pursue remedies under G. L. c. 93A. [465]
An insurer's G. L. c. 93A claim against its insured was remanded for fur-
    ther findings by the trial judge. [465-467]

CIVIL ACTION commenced in the Superior Court Depart-
ment on February 3, 1983.

This case was heard by *Elbert Tuttle*, J.

*James R. Rosencranz* for the plaintiffs.

*Thomas C. Federico* for the defendant.

KASS, J. When the excess and obfuscation which cluttered
the pleadings were discarded, the action emerged as a claim

[1]Richard Binder.

on an insurance policy to recover losses suffered by Sidney Binder, Inc. (the "store corporation"), in a burglary of its jewelry shop in Plymouth. Among the defenses set up by Jewelers Mutual Insurance Company, Inc. (the "insurer"), was that the heist had been staged by, or for, Richard Binder, the principal officer of the store corporation. There were the usual cross salvos under G. L. c. 93A to add menace to the positions of the parties. Cf. *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 857 (1983).

A jury returned a general verdict for the insurer on the contract claim. The judge dismissed both of the c. 93A claims. The store corporation has appealed from the common law judgment but has not in its brief pressed the c. 93A point. The insurer has appealed from the adverse judgment against it on its c. 93A counterclaim.

Beginning in 1978, Binder assumed responsibility for running the family jewelry repair business[2] and took it into retail sales. In mid-1980, lured by the rising price of gold, Binder organized a separate corporation, Bay State Gold and Silver Exchange, Inc. (Bay State), which engaged in the purchase and sale of scrap gold and silver. Binder owned all of Bay State's stock and occupied the entire executive suite; he was the president, vice-president, treasurer, and clerk. To expand Bay State's business Binder wanted a $1,000,000 loan, but speculating in precious metals was not a bankable proposition. An acquaintance steered Binder to a lending source in the Bahamas, International Premium Investments, Inc. (IPI), which agreed to make an $800,000 loan. IPI made loan disbursements in $500,000 and $300,000 installments, for each of which Bay State gave a promissory note in the amount of the loan proceeds received. Binder was uncer-

---

[2]Binder owned fifty percent of the stock of the store corporation. His mother owned the other fifty percent but was not active in the business. Binder's father had started the business. Ill health had forced the father's retirement.

tain whether he had personally guaranteed the promissory notes.[3]

In January, 1981, the price of gold plummeted and so did Bay State's profits. Binder wound up the gold and silver business and closed Bay State's doors. Evidence was conflicting about what, if anything, was still owed to IPI at that time. Binder testified that the IPI loan had been repaid entirely. Financial statements which its accountant prepared for Bay State showed that as of May 31, 1981, Bay State owed IPI $440,000. There was a loan payable to an employee in the amount of $70,000. An unsecured loan of $100,000 by Binder from Bay State funds to the wife of a cousin had been half repaid, but recovery of the balance was not promising.

For July, 1981, Binder planned a jewelry sale for the retail store. In anticipation, he took in inventory, by purchase and consignment, much above the usual amount and, for the period of the sale, July 7th through August 16th, raised the store corporation's coverage with the insurer from the usual $101,000 to $450,000. Sometime between the evening of Saturday, July 11, 1981, and the morning of Monday, July 13, 1981, burglars made off with most of the inventory. Binder calculated a loss of $536,401.90 and claimed the face value of the insurance policy. We shall add, in the context of a discussion of the points contested on appeal, other facts which the jury, on the evidence, could have found.

1. *Evidence Issues.*

(a) *Relevance of Bay State's business.* Much evidence came in concerning the business affairs of Bay State. Those affairs cast an aura damaging to the store corporation's case. The evidence related to Binder's trip to the Bahamas for the loan, the remarkably sketchy documentation of the loan, the absence of any records of repayment, nighttime flights of gold to a refinery, and the mercurial rise and fall of Bay State with the concomitant suggestion that Binder was saddled with personal obligations on a substantial chunk of Bay

---

[3]There was evidence of additional borrowing by Bay State from IPI. It is not necessary to decision of the case to spell out the details of those other loans.

State's debt. All that harmful evidence, the store corporation argues, was irrelevant to it, let alone material.

Relevant evidence is that which has a rational tendency to prove an issue. *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977). *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984). To be relevant, evidence need not establish directly the proposition to be proved — here that Binder was in financial straits; it is enough if it furnishes links in the chain of proof. *Ibid.* Liacos, Massachusetts Evidence 408 (5th ed. 1981). The pertinence of the evidence about Bay State was what it tended to prove about Binder's motive to stage a burglary of the jewelry store. Evidence of motive rounds out the jury's picture of a case and sheds light on other evidence suggesting that the accused has committed the act charged. See *Commonwealth* v. *Brown*, 376 Mass. 156, 164 (1978); *Commonwealth* v. *Hogan*, 12 Mass. App. Ct. 646, 654 (1981). Deciding whether particular evidence of motive is more probative than it is unfairly prejudicial rests in the sound discretion of the trial judge. *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982). *Commonwealth* v. *Hogan, supra* at 654.

The plaintiffs argue that the finances of Bay State, a distinct corporate entity, are irrelevant to the store corporation or to Binder personally. That view requires overlooking that Binder was the controlling personality in both corporations. There was also evidence that on at least one occasion Binder used money from Bay State to buy inventory for the store corporation.[4] The jury could find that Binder had guaranteed personally the larger loans to Bay State from IPI. These interconnections served to round out other evidence that the store burglary had been staged. Evidence that Binder had reasons to want very much the proceeds of insurance and the proceeds of the sale of the "stolen" jewelry rendered more plausible evidence that he had set up the burglary. It is cor-

---

[4]As Binder aptly responded to a question about using Bay State funds to pay for inventory for the store corporation, "Bay State Gold and Silver was mine. I mean, I owned it all. There might have been some money over there that I used to purchase that merchandise on the other side."

rect, as the store corporation emphasizes, that interdependence and common ownership of stock do not necessarily justify disregarding a corporation as a separate legal entity. *Gordon Chem. Co.* v. *Aetna Cas. & Sur. Co.*, 358 Mass. 632, 638 (1971). If corporate structures are manipulated for a fraudulent purpose, however, their separateness need not be respected. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618-620 (1968). Fraudulent use of related family entities in the interest of a common dominant officer is at the core of the insurer's defense. The trial judge acted within his discretion in receiving evidence of Bay State's financial history.

(b) *Admission of accountant's reports as business records under G. L. c. 233, § 78.* Through Bay State's accountant, the defense placed in evidence balance sheets dated September 30, 1980, and May 31, 1981, unsigned copies of Bay State's State and Federal income tax returns for 1980 and 1981, financial statements, and the accountant's worksheets for the tax returns. The purpose of these documents was to prove that Bay State faced significant debt. Although hearsay, the documents were received, over the plaintiffs' objection, under the exception made by G. L. c. 233, § 78, for records made in good faith in the regular course of business. On appeal the plaintiffs argue that the hearsay exception established by § 78 pertains only to the original record entries which a business maintains and does not reach the papers worked up by an accountant because the latter are derived from data about which the accountant may or may not have personal knowledge. Compare *Bouchie* v. *Murray*, 376 Mass. 524, 528-529 (1978) (relating to hospital records), with *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 406-408 (1982). See also *Kelly* v. *O'Neil*, 1 Mass. App. Ct. 313, 316-317 (1973).

We need not and do not decide the point because the objection at trial was misfocused. The colloquy which occurred when the accountant's papers were offered was as follows:

THE COURT: "Now, what is your objection?"

MR. CROWE (trial counsel for the plaintiffs): "My
first objection is on the grounds of relevancy."

THE COURT: "I understand that."

MR. CROWE: "My second objection is on the grounds
that there has been no identification or connection be-
tween Richard Binder and any of this paperwork. There
is no signature, as far as I can tell, on any of these
things, and I do not think they are admissible. Nor do I
think that they are probative."

THE COURT: "Anything else you want to say?"

MR. CROWE: "No."

No doubt the material was relevant because it tended to
prove Bay State owed money. The second objection, perhaps
directed to a question of authentication, did not at all direct
the judge's attention to whether the papers were entries,
writings, or records of a business within the meaning of
G. L. c. 233, § 78. Error has not occurred if a party makes
an incorrect objection at trial which the judge overrules. The
party against whom the evidence is admitted may not later
urge a correct ground on appeal. *Kagan* v. *Levenson*, 334
Mass. 100, 107 (1956). *Taunton Greyhound Assn.* v. *State
Racing Commn.*, 10 Mass. App. Ct. 297, 302 (1980). Liacos,
Massachusetts Evidence at 73.

2. *Sufficiency of the Evidence.*

The plaintiffs say they were entitled to a directed verdict
as to the insurer's affirmative defense that Binder had staged
the burglary. In addition to evidence of motive, there was
evidence that: Binder had not taken out increased insurance
on the occasion of an earlier sale when the store corporation
also had taken on additional inventory; Binder was the last
person in the store before discovery of the burglary; when
Binder had left the store on Friday at closing time he had
told an employee, Lena Bolduc, that he had forgotten some-
thing and reentered it; the alarm system had been turned off
at the time of the burglary; Binder was one of four or five
people with keys to the front door and the alarm system; the
burglars had apparently entered through the front door but
had contrived to make it appear that they had used a trap

door; on the Monday morning after the burglary (i.e., just before its discovery), Binder asked Lena Bolduc to use her key to open the front door even though she was carrying a package and his hands were free. This was sufficient evidence, looked at in the light most favorable to the insurer, to justify the jury in finding for the insurer. See *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972); *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 729 (1979). See also as to the sufficiency of the evidence, *Osvaldo Varane, Inc.* v. *Liberty Mut. Ins. Co.*, 362 Mass. 864 (1972); *Commonwealth* v. *Walter*, 10 Mass. App. Ct. 255, 257-261 (1980); *Commonwealth* v. *Shuman*, 17 Mass. App. Ct. 441, 442-447 (1984).

3. *The Insurer's c. 93A Claim.*

In its counterclaim the insurer alleged that it had been put to investigation and legal expenses and was, thus, damaged by the plaintiffs' fraudulent conduct. There is a threshold question whether an insurance company, a closely regulated business (see G. L. c. 175 and c. 176D, the latter relating specifically to insurance companies and unfair and deceptive acts), is entitled to the remedies of c. 93A. It was decided in *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72 (1977), that, notwithstanding G. L. c. 176D, an insurance company was answerable to a claim under G. L. c. 93A. In *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. at 851-858, the right of an insurance company to recover under c. 93A was assumed when based on fraudulent representations to the insurer in connection with performance and payment bonds. Discussion centered on the method of awarding multiple damages. We think that the *International Fidelity* case stands for the proposition that insurance companies may pursue remedies under c. 93A, as well as be pursued.

The judge considered the c. 93A claim jury-waived. His findings in denying c. 93A recovery to the insurer are extremely meagre. The only "finding" is really a conclusion: "The court concludes after an examination of all of the evidence that neither party has sustained its burden of proof by a preponderance of the evidence that any of the actions of

either party constituted an unfair and deceptive act or prac-
tice as defined by chapter 93A of the General Laws."

What precedes that sentence is a brief recitation of evi-
dence. By way of example, the judge wrote: "Considerable
evidence was presented concerning the method of the robbery
and the fact that the alarm system in the jewelry store was
off at the time of the robbery.

"Considerable evidence was presented concerning the
maintenance by Binder's Jewelry of inventories and stock
lists on the warranty issues.

"Considerable evidence was presented to the court con-
cerning whether Binder's Jewelry failed to fulfill the condi-
tion precedent in the policy requiring the maintenance of a
proper inventory in violation of paragraph 8A of the policy
(exhibit 1)."

Sometimes when a judge recites evidence it is possible to
decipher from the selection of evidence described what the
judge in fact found. Cf. *Service Publications, Inc.* v.
*Goverman*, 396 Mass. 567, 578 n.13 (1986); *Shaw* v. *Rod-
man Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 710-
712 (1985). We cannot fill in the blanks in that fashion here
because the judge mentions miscellaneous swatches of evi-
dence, some of which have to do with fraud and some of
which do not.

The insurer argues that as the judge mentions evidence
tending to prove the staged burglary theory, there must have
been fraud and that c. 93A liability is a foregone conclusion,
the only question left being damages. Although this opinion
has focused on the staged burglary theory, because the points
raised by the plaintiffs were directed to it, the judge may
have found that a staged burglary had not occurred and he
may have found failures to comply with policy requirements
which justified the jury's verdict. Explanatory findings are
necessary. *Schrottmann* v. *Barnicle*, 386 Mass. 627, 638
(1982). *Lynn* v. *Nashawaty*, 12 Mass. App. Ct. 310, 315
(1981). *Friedman* v. *Kurker*, 14 Mass. App. Ct. 152, 160-
162 (1982). *Turner* v. *Leonard*, 17 Mass. App. Ct. 909, 910
(1983).

The judgments entered on the jury verdict and the plaintiffs' c. 93A claim are affirmed. The judgment on the defendant's c. 93A claim is vacated. That aspect of the case is remanded to the Superior Court so that the judge who heard the case may make subsidiary findings of fact and, on the basis of those findings, a new judgment is to be entered. The judge, solely within his discretion, may reopen the evidence for the purpose or act on the existing record.

*So ordered.*