Whitehead, J.
Introduction
The defendant, James Kartell, stands indicted on a charge of murder. It is alleged that he killed the paramour of his estranged wife. In anticipation of trial, the Commonwealth has subpoenaed records of psychological counselling which the defendant received from Michael Lawler, Ed.D., prior to the alleged crime. Doctor Lawler has moved to quash the subpoena on the ground that the records are subject to the mental *226 health counselor privilege established by G.L.c. 122, §172. The defendant has joined in the motion. The Court held an evidentiary hearing relative to the motion on September 22, 1999, October 7, 1999, and October 26, 1999. The following constitute the Court’s findings of fact, rulings of law and order on the motion.
Findings of Fact and Rulings of Law
The defendant has been married to Suzan Kamm for thirty-three years. The defendant is a physician. Doctor Kamm is a licensed independent clinical social worker. In August 1998, Dr. Kamm told the defendant that she had fallen in love with Janos Vajda, the alleged victim in this case, and that she wanted a divorce. The defendant countered by suggesting that he and Dr. Kamm undergo counselling. She agreed. Through her professional contacts, Dr. Kamm learned of Michael Lawler, who provides counselling services to couples. Commencing on August 18, 1998, the defendant and Dr. Kamm attended approximately 20-22 counselling sessions with Dr. Lawler. The purpose of those sessions with Dr. Lawler was to enable the couple to determine in which direction their relationship should head, ie., reconciliation or divorce. In addition, to the joint sessions, both the defendant and Dr. Kamm attended individual sessions with Dr. Lawler. As Dr. Kamm herself noted in her testimony at the motion hearing, individual sessions play a role in joint therapy. It is important that the therapist understand the issues facing each of the individuals, in order that he might appreciate the manner in which those issues bear on the problems existing between the couple.
During one of her individual meetings with Dr. Lawler, Dr. Kamm learned that he had obtained information about her which she felt that he was not authorized to have. On December 28, 1998, she terminated her therapy with Dr. Lawler. The evidence did not establish when, if ever, the defendant ceased his relationship with Dr. Lawler.
During the period of treatment with Dr. Lawler, both the defendant and Dr. Kamm understood that their communications with Dr. Lawler were confidential. It is Dr. Lawler’s records of those communications which the Commonwealth has subpoenaed. The motion to quash is based on the claim that Dr. Lawler is an “allied mental health and human services professional,” specifically, “a mental health counsellor,” and that, being given in confidence, the respective spouses’ communications with Dr. Lawler are therefore privileged.
General Laws c. 112, §172 provides that all communications between an “allied mental health or human services professional” and a client “shall be deemed to be confidential.” General Laws c. 112, §163 defines an “allied mental health and human services professional” as “a licensed marriage and family therapist, a licensed rehabilitation counsellor, a licensed educational psychologist or, a licensed mental health counselor.” In fact, Dr. Lawler holds himself out as a “licensed mental health counsellor.”
General Laws c. 112, §163 defines a “licensed mental health counselor” as “a person licensed or eligible for licensure under [G.L.c. 112, §165].” All parties stipulate that Dr. Lawler does not actually hold a license as a mental health counsellor issued by the Board of Registration of Allied Mental Health and Human Services Professionals. However, Dr. Lawler and the defendant contend that Dr. Lawler is “eligible for licensure.”
With respect to the criteria which one must meet in order to be “eligible for licensure,” G.L.c. 112, §165 provides, in relevant part, as follows:
The board may issue a license to an applicant as a . . . mental health counselor; provided, however, that each such applicant shall provide satisfactory evidence to the board that such applicant: (1) is of good moral character; (2) has not engaged or is not engaging in any practice or conduct which would be grounds for refusing to issue a license under section one hundred and sixty-nine; (3) demonstrates to the board, the successful completion of a masters degree in a relevant field from an educational institution licensed by the state in which it is located and meets national standards for granting of a masters degree with a subspecialization in . . . counseling, or a relevant subspecialization approved by the board. To be eligible for licensure, an applicant must have two additional years of supervised clinical experience in the relevant field in either a clinic or hospital licensed by the department of mental health or accredited by the Joint Commission on Accreditation of Hospitals or in an equivalent center or institute or under the direction of a supervisor approved by the board. For purposes of this clause, “Supervision” shall be defined as no less than two hundred hours of supervised clinical experience at least one hundred hours of which shall consist of individual supervision with a clinician who has expertise in . . . educational psychology, or counseling and who holds a masters degree in social work . . . educational psychology, counseling or an equivalent field or holds a doctorate degree in psychology, or a medical degree with a sub-specialization in psychiatry; (4) successfully passes a written or oral examination administered by the board to determine the applicant’s qualifications for licensure for each profession licensed pursuant to this section; and (5) individuals licensed under the provisions of this section will not be eligible to renew licenses issued pursuant to the provisions of section three of chapter eight hundred and eighteen of the acts of nineteen hundred and seventy-seven unless such individuals satisfy the requirements of section one hundred and thirty-one of chapter one hundred and twelve, except for successful completion of an examination.[1]
*227 General Laws c. 13, §90 provides that the Board “shall promulgate regulations which set forth education requirements necessary for a person to be licensed under the provisions of’ §165. Although §90 does not specifically empower the Board to regulate the supervised clinical experience requirement of §165, it does state that the Board “may, from time to time, adopt such rules and regulations as it deems necessary to carry out the performance of its duties.” Section 165, itself, does provide that the Board “shall promulgate rules and regulations specifying the qualifications of the supervising clinician.”
Pursuant to its rule-making authority, the Board has promulgated detailed rules and regulations concerning the education and supervised clinical experience requirements which one must meet before being eligible for licensure. Those regulations are codified in 262 C.M.R. 2.01. They are too extensive to quote or even summarize here. Notable, however, is the fact that, by way of the regulations, the Board has expanded the supervised clinical experience requirement from the statutorily mandated minimum of 200 hours to a minimum of 3,360 hours, and it has defined with greater particularity than the statute the nature of the required experience.
At this point, the Court notes as an aside that, during the motion hearing, Dr. Lawler characterized this expansion of the statutorily prescribed minimum supervised clinical experience requirement as ultra vires.[2] The Court disagrees. The rule-making authority of the Board, as articulated in G.L.c. 13, §90 is broad. Moreover, it is evident that the General Court desired that the Board take an active role in determining standards for licensure. In that regard, §90 provides that the Board “shall establish standards committees for each allied mental health and human services profession” and that “each standards committee . . . shall recommend approval or disapproval of the granting of all licenses for that profession, provide for the grading of that examination and provide for other matters relating to the standards for licensure in that profession.” (Emphasis supplied.) The section further provides, “No decision of a standards committee shall become effective until approved by the [B]oard. The [BJoard may initiate or otherwise act regarding any matter in which a standards committee is authorized to act.” (Emphasis supplied.) The regulations here in question are consistent with the exercise of discretion which the General Court appeared to give to the Board when it enacted §90 and §165. They are directed to the purposes of the statutes and are reasonable in scope. The Court concludes that they are valid.
Doctor Lawler and the defendant contend that the records here at issue are privileged because Dr. Lawler is “eligible for licensure” as a mental health counselor; he is therefore deemed to be a “licensed mental health counselor”; and, thus, any communications between him and his patients, Dr. Kartell and Dr. Kamm, are subject to the patient/mental health counsellor privilege. The parties agree that the existence or non-existence of the privilege, and therefore the disclosure of the subject records, turns on the single issue of whether or not Dr. Lawler is “eligible for licensure” under G.L.c. 112, §165. In that regard, the parties stipulate that Dr. Lawler is of “good moral character” and that he has not engaged in “any activity or conduct which would be grounds for refusing to issue a license under section one hundred and sixty-nine.” Thus, the only factual issue to be resolved is whether or not Dr. Lawler meets the remaining criteria for licensure. In the resolution of that issue, the threshold question presents itself: Which of the remaining criteria are applicable? At the hearing on the motion, the parties proceeded on the assumption that the criteria numbered “4,” relating to passage of an examination, and “5,” relating to renewals of grandfathered licenses, are inapplicable. In their view, the only criterion which needed to be addressed was number “3,” which deals with education and supervised clinical experience. The Court has a different view.[3] Criterion number “4" is clear. In order to be "eligible for licensure," a candidate must “successfully pass a written or oral examination administered by the [BJoard to determine the applicant’s qualifications for licensure ...” The Court sees no reason why that criterion should be ignored in this case. If one could have de facto licensed status without taking the examination, he or she would have no incentive ever to take the examination. To disregard the examination requirement and to deem “eligible for licensure” and, therefore, de facto licensed, individuals who had not taken and passed the examination would have the effect of giving licensed status to individuals whose actual competency to practice has never been the subject of independent determination by the Board. This would fly in the very face of the purpose underlying the creation of the Board, namely, to ensure that mental health professionals meet certain standards of competency. Thus, in the view of the Court, the only fair reading of §165 is that which requires candidates to take and pass the examination before they may be considered “eligible for licensure” and deemed to be licensed.[4]
In the present case. Dr. Lawler has acknowledged that he has never taken the examination for licensure as a mental health counsellor. He has taken, but failed to pass, the examination for licensure as a psychologist. Because he has not met the examination requirement of §165, he is not “eligible for licensure" under the section and cannot be deemed a “licensed mental health counsellor” within the definition of §163.
However, the Court will assume for the moment that Dr. Lawler need not satisfy the examination requirement of §165. It then turns to the question, on which the motion hearing focused, of whether or not he is able to meet the education and supervised clinical *228 experience requirements of the statute and related regulations. In truth, for purposes of this proceeding, it is more accurate to put the question as follows: Would Dr. Lawler be able to demonstrate to the Board’s satisfaction that he has met the education and supervised clinical experience requirements? Given that Dr. Lawler is asserting the privilege at issue here, the burden is on him to convince the Court that he would be able to make the necessary demonstration to the Board. See, e.g., In re: Grand Jury Proceedings, 183 F.3d 77, 73 (1st Cir., 1999) (“as a general matter, a party asserting a privilege has the burden of showing that the privilege applies"). See generally Wright and Graham, Federal Practice and Procedure, Vol 23, §5422, p. 670 (1980). Compare In re: Reorganization of Electric Mutual Liability Insurance Co., Ltd. (Bermuda), 425 Mass. 419, 421 (1993) (burden of proving existence of attorney-client privilege rests on claimant).
The Court is not convinced that Dr. Lawler would be able to satisfy the Board that he possesses the necessary educational and clinical background. The evidence of his background which he presented to the Court consisted of a transcript of his studies at the Harvard University Graduate School of Education, from which he received a doctoral degree in education; academic bulletins from the Postgraduate Center for Mental Health, in New York City, from which he received a certificate of post-graduate study; an affidavit from one of his graduate professors at Harvard; an affidavit and testimony from one of his post-graduate professors at the Postgraduate Center for Mental Health; a copy of his curriculum vitae; and his own testimony concerning his education and training.
Rosemary Winstanley, the Chairwoman of the Board of Registration of Allied Mental Health Professionals, testified that the transcript from Harvard was insufficient to establish that Dr. Lawler completed more than two of nine courses which the Board’s regulations require. She also testified that the transcripts failed to establish that Dr. Lawler’s graduate curriculum contained the necessary hours of internship and practicum outlined in the regulations. She went on to state that, because the Postgraduate Center for Mental Health is not an educational institution authorized to grant a Master’s or Doctor of Philosophy Degree, the Board would not credit the courses which Dr. Lawler took at that institution towards the education requirement set forth in the regulations. Hence, according to Dr. Winstanley, were the Board to look only at the documentary evidence available to the Court, as a matter of practice, it would deny Dr. Lawler licensure based upon a failure to meet the Board’s educational requirement. The Court credits that testimony.[5]
Of course, during the license application process, Dr. Lawler would not be limited to producing his Harvard transcripts and the documentary evidence from the Postgraduate Center for Mental Health. However, as Dr. Winstanley also noted, the Board’s regulations would place the burden on him to produce sufficient additional evidence that he has satisfied the education and supervised clinical experience requirements. See, 262 C.M.R. 2.01(1). In that regard, the Board would not accept the word of Dr. Lawler alone. It would require independent verification from the relevant educational institutions and clinicians. Would Dr. Lawler be able to produce such verification? The Court thinks not. It is notable that, despite the fact that the hearing on the motion occurred on three dates over a one-month period, and despite the fact that the Commonwealth challenged him to produce the necessary verification over that period, he declined to do so. Rather, he gave a lengthy oral account of the content of his graduate and post-graduate studies and of his clinical experience. The Court is dubious of that account.
With regard to the education requirement, Dr. Lawler was asked to dredge his memory to recall in detail the content of courses which he took nearly thirty years ago. That was a difficult task, and Dr. Lawler acknowledged it to be so when he stated, “Some things I can remember and some I am not very clear on.” (Tr. II, p. 74.) Indeed, at the outset of his testimony, Dr. Lawler could not even remember the years in which he had received his Master’s and Doctoral degrees. (Tr. II, p. 14.) Necessarily, his description of the courses which he took was vague. For example, he described a course entitled “Individual Instruction, Field Work or Research in Guidance,” as follows: “I did a lot of reading with [the professor).” (Tr. II, p.19.) He characterized another course, entitled “Individual Instruction, Field Work, or Research in Psychology,” in this manner: “It focused on couples and family. There were about six or seven people. It was a seminar, readings.” (Tr. II, p. 20.)[6] On still another occasion, he described a second course entitled, “Individual Instruction, Research or Field Work in Guidance” as follows: “I had private meetings with [the professor], a leader in this field, a lot of things around race and class and community health, ethnicity.” (Tr. II, p. 27.)
Moreover, perhaps reflective of a certain liberality which may have existed within academia during the late 1960s and early 1970s, many of Dr. Lawler’s courses were relatively unstructured in nature. The Court had difficulty determining, from Dr. Lawler’s account, exactly what they involved. Regarding his curriculum, Dr. Lawler himself acknowledged, “I didn’t have a traditional sort of curriculum. I made up my own program of study at Harvard.” (Tr. II, p. 22.) Later, he added, “(I]t is not your traditional course where there are distinct things that everybody takes. I had certain topics or themes that I was interested in and I put them into a lot of courses with a lot of professors.” (Tr. II, p. 25.)
The Court also noticed a distinct tone of “puffery” in Dr. Lawler’s testimony. Some of that tone was *229 projected in his demeanor. Some of it was apparent from the content of the testimony itself. On several occasions, he sought to credit toward content areas required by the Board’s regulations, courses which touched only incidentally on those content areas. For example, he sought to credit two courses (Numbered 300 and 340, both with Professor Jones) toward the required content area: “Psycho-Pathology, Abnormal Psychology, Abnormal Behavior, Etiology, Dynamics, Treatment of Abnormal Behavior.” On the face of the course descriptions, the relevance of those courses to the content area was not apparent. Addressing that issue, Dr. Lawler stated, “I took several courses that included that area. That might not have been the focus but there were several courses that included it.” (Tr. II, p. 23.) In seeking to credit a certain seminar which he took at the Harvard Medical School Laboratory for Social Psychiatry toward the content area, “Professional Orientation, Ethics and Legal Issues,” Dr. Lawler acknowledged that the focus of the seminar was elsewhere, but he asserted that the issue of “informed consent” was “an issue that was brought up in every research topic that [was] discussed in the seminar. [The professor] would invariably bring up the whole issue of the ethics of research and informed consent, whether the protocols were understood by the subject. So, that definitely fit that.” (Tr. Ill, p. 104.) Similar “reaching” to credit particular courses to particular content areas is apparent in the balance of Dr. Lawler’s testimony.[7]
The Court does not question that Dr. Lawler took the courses which he states that he took. However, given the quality of the testimony, it ultimately cannot make a finding that any of the Harvard courses (with the possible exception of the two noted by Dr. Winstanley) met the requirements of the Board. Moreover, even if Dr. Lawler did, in reality, take the required number of courses in the required content areas, it is clear that he would not be able to document the course content in a way sufficient to convince the Board to credit the courses to the education requirement. In that regard, Dr. Lawler himself acknowledges that the content of his courses was not set forth in any formal document. Rather, it would have been set forth in notes which would have been kept in the “private flies” of professors and “probably won’t exist now.” (Tr. II, pp. 78-79.) Lastly, whatever may have been the content of the courses taken at the Postgraduate Center for Mental Health, those courses cannot be credited because, as Dr. Winstanley noted, the Center lacks degree-granting authority. See 262 C.M.R. 2.01(2).
With respect to the supervised clinical experience requirement, the situation is similar. According to Dr. Lawler, his supervised clinical experience was varied and extensive. However, much of it occurred two decades ago. Again, his accounts of such experience were necessarily vague. For example, Dr. Lawler described some of his clinical experience while at the Postgraduate Center for Mental Health simply as follows: “I had sort of a general practice. I was seeing couples and families.[8] (Tr. II, p. 53.) He frequently described the “supervision” component of his clinical experience as “meeting with” or “working with” the supervisor. When pressed to define what he meant to say by that, he replied as follows:
There are various definitions. For example, in [a specified in-patient unit] when I worked there [the supervisor] worked with me on everything from formal supervision to frequent discussions of clinical issues or psychological issues throughout the week.
Another place it might be, for example in the case of [another supervisor], it was less frequent face to face and more phone conversations or infrequent conversations.
(Tr. IE, p. 106.) The specific content of the discussions was not addressed.
As was the case with respect to the testimony concerning his education, Dr. Lawler’s testimony concerning his supervised clinical experience carried with it a tone of “puffery.” He mentioned Dr. Norman Neiberg prominently as one of his supervisors. In that regard, he stated of Dr. Neiberg, “He was sort of a constant supervisor of mine for about twenty years probably.” (Tr. II, p. 58.) However, Dr. Lawler ultimately acknowledged the very unique nature of that “supervisory” relationship: “I employed him as a supervisor to talk about my private practice and my work at the hospital.” (Tr. II, p. 42.)[9] Dr. Lawler appeared to “reach” and credit work having little to do with mental health counselling (e.g., operating a private school in Cambridge). When asked if he possessed written evaluations concerning his clinical work while at Harvard, he insisted that he did and cited the course transcripts themselves as the evaluations to which he was referring. He possessed no other documentation of any of his clinical experience.
The Court does not doubt that Dr. Lawler has worked many hours at many places, or that a significant number of those places have provided psychological services. However, as was the case with Dr. Lawler’s education, based upon the quality of the testimony presented, the Court cannot make a finding concerning the substance of that experience, including the supervision component, sufficient for it to conclude that Dr. Lawler has met the 3,360-hour supervised clinical experience requirement established by the Board.[10] Even if, in reality, he has engaged in 3,360 hours of supervised clinical experience, the Court is doubtful that Dr. Lawler could provide documentation of his experience sufficient to satisfy the Board.
It should be apparent that even if the role of the Court were not to judge how the Board would act with respect to the licensure of Dr. Lawler, but rather it were *230 to decide for itself whether Dr. Lawler ought to be licensed, the result would be the same. Given the nature and quality of Dr. Lawler’s testimony, the Court itself would look for independent verification that he had met the Board’s education and supervised clinical experience requirements. That verification has not been presented.
All of what has been said concerning Dr. Lawler’s testimony is not to dismiss him with a wave of the hand. He apparently is a man of some status in the mental health community. He was asked to perform a difficult task when he was placed on the witness stand and told to give an account of his entire education and training, much of which had occurred during the Nixon-Ford administrations. However, to quote a figure from a slightly later era, in dealing with Dr. Lawler’s account, the better policy seems to be “trust but verify.”
It follows, then, that Dr. Lawler neither holds a license as a mental health counselor, nor is he “eligible for licensure” pursuant to the provisions of G.L.c. 112, §165. Accordingly, he is not a “licensed mental health worker,” and the communications which are contained in the records at issue in this case are not subject to the patient/mental health worker privilege articulated in G.L.c. 112, §172.
However, the matter does not end there. The defendant argues that, even if the subject records do not contain privileged information, they are beyond the proper bounds of subpoena. He contends that, given the purpose for which the defendant and Dr. Kamm spoke with Dr. Lawler, and given the understanding of each, that Dr. Lawler would not disclose their communications with third parties, the records concerning those communications are clothed with at least a level of confidentiality sufficient that the Court, under Mass.R.Crim.P. 14(a)(6), should deny discovery as a matter of discretion. He characterizes the subpoena as a “fishing expedition” and notes that the Commonwealth has made no showing of what it believes the subject records to contain.
It appears true that the Commonwealth may have gone fishing. However, the fact is that the pond is very likely to be well stocked. On the Commonwealth’s theory of the case, the defendant killed the alleged victim in some kind of dispute over the defendant’s wife. The defendant and his wife were separated at the time. They had come to be treated by Dr. Lawler as a result of her relationship with the alleged victim. It is highly likely that Dr. Lawler’s records will contain an indication of what the defendant’s state of mind was concerning the alleged victim and the alleged victim’s relationship with the defendant’s wife.
As authority supporting the quashing of the subpoena, the defendant cites Bernard v. Commonwealth, 424 Mass. 32 (1996). There, a “peer counselor” with the Massachusetts State Police sought a protective order under Rule 14(a)(6) relative to communications made to him by a fellow trooper. The Supreme Judicial Court held that such an order was required. However, that case is different from this one. In Bernard, the Supreme Judicial Court concluded that the communications in question actually were privileged. Specifically, they were encompassed by the social worker/client privilege enunciated in G.L.c. 112, §§135A and 135B. In this case, the communications are not protected by any privilege.
The Court considers the authorities applicable here to be Commonwealth v. Bishop, 416 Mass. 169, 185-86 (1993), and Commonwealth v. Pare, 43 Mass.App.Ct. 566, 570-73 (1997), affirmed, 427 Mass. 427 (1998). Both cases stand for the proposition that the standard for disclosure of non-privileged information which a party in a criminal proceeding seeks to offer into the evidentiary arena is the standard of relevance. The Appeals Court, in Pare, described that standard as follows:
Evidence is generally relevant so long as it has “a ‘rational tendency to prove an issue in the case,’ ” or makes a “desired inference more probable than it would be without” the evidence. Commonwealth v. Fayerweather, 406 Mass. 78, 83 (1989), quoting from, respectively, Commonwealth v. Chretien, 383 Mass. 123, 136 (1981), and Commonwealth v. Copeland, 375 Mass. 438, 443 (1978). The desired evidence “need not establish directly the proposition sought; it must only provide a link in the chain of proof.” Commonwealth v. Gordon, 407 Mass. 340, 351 (1990), quoting from Commonwealth v. Tobin, 392 Mass. 604, 613 (1984). Indeed, evidence is to be considered relevant if it only “throw[s] light,” Commonwealth v. Palladino, 346 Mass. 720, 726 (1964), or “shed[s] light on an issue,” Adoption of Carla, 416 Mass. 510, 513 (1993), or, “inconnection with other evidence, it helps [the fact finder] a little.” Commonwealth v. Tucker, 189 Mass. 457, 467 (1905). It is relevant if it “could have been helpful” for a jury in determining whether a complainant was telling the truth. Commonwealth v. Fayerweather, supra at 83 (a child sexual abuse case). So long as evidence possesses any of these probative tendencies, even if it “is of marginal significance, we cannot say that it [is] irrelevant.” Cohen v. Liberty Mutual Ins. Co., 41 Mass.App.Ct. 748, 752 (1996).
43 Mass.App.Ct. 572-73 (footnotes omitted). Where the issue is one of criminal discovery, the term is even more broadly construed. In that context, the term relevant “has been authoritatively defined . . . ‘broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.’ ” 43 Mass.App.Ct. 573, fn. 15 (Citations omitted.)[11] Both Bishop and Pare dealt with access to records relating to an alleged crime victim. However, this Court sees *231 no reason to apply a different standard concerning records relating to a criminal defendant.
Whether the instant subpoena is viewed as a trial subpoena or as a “discovery subpoena,”[12] the Commonwealth has met the test of relevance here for the reasons previously discussed. That is to say, the records in question are likely to contain evidence indicative of the defendant’s state of mind toward his wife and her relationship with the victim, and his state of mind in those respects bears directly on his motive to commit the alleged crime. Accordingly, the Court sees no basis on which to quash the subpoena.[13]
Order
The motion of Dr. Michael Lawler to quash the subpoena duces tecum which the Commonwealth has issued for his records is DENIED.

Statutes 1977, c. 818, contains a grandfathering provision not applicable to this case.

The point was not addressed in the memorandum which Dr. Lawler filed after the hearing.

Indeed, the Commonwealth has altered its position in its post-hearing memorandum.

The Court observes also that G.L.c. 112, §167 allows the Board to issue a one-year “temporary permit" to an individual who is waiting to take the first written examination offered by the Board after filing of an application for licensure. There would be no need for such a permit if the applicant were deemed licensed anyway.

Dr. Winstanley did not address the issue of whether Dr. Lawler would be able to meet the Board’s supervised clinical experience requirement.

Dr. Lawler also acknowledged that the course was not actually taught by the Harvard professor listed in the transcript. Rather, it was taught by an outside instructor, with the Harvard professor merely “signing off’ on the course content. (Tr. II, p. 20.)

A notable example is found at Tr. Ill, pp. 93-98, where Dr. Lawler seeks to credit a particular course at the Postgraduate Center for Mental Health to more than one content area and where, at one point, he credits virtually his entire curriculum at the Postgraduate Center to another area.

As it happens, that particular clinical experience was offered by Dr. Lawler as an important component of the 3,360 hours required by the regulations. However, 262 C.M.R. 2.01 4(4)(a) provides, "Independent private practice experience will not be accepted as qualifying clinical experience to be credited toward the clinical experience requirement.”

 262 C.M.R. 2.01(2) specifically excludes “peer” supervision from the definition of “qualifying supervision” under the regulations.

The Court notes that much of the clinical experience tendered by Dr. Lawler did not include “on site” supervision by staff members of the institution with which Dr. Lawler was employed or by contract supervisors. Such “on site” supervision is a prerequisite to being deemed “qualifying supervision” under the regulations. See 262 C.M.R. 2.01(2)(a) 2.9 and 262 C.M.R. 2.01(4)(d)(b).

In Pare the Appeals Court assumed that the standard of relevance applicable to civil discovery was also applicable to criminal discovery.

See generally Commonwealth v. Neumeyer, 48 Mass.App.Ct. 154, 162 (1999), and Mass.R.Crim.P. 17(a).

This result, of course, invites the question: Must every patient see the license of his counsellor before he/she can be sure that his communications will be protected from disclosure? Unfortunately, the answer is probably, “Yes.” The withholding of relevant evidence from a Court frustrates the truth-finding process. Thus, historically, exemptions from disclosure have been very narrowly drawn. Where the requirements of privilege have not strictly been satisfied, protection from disclosure routinely has been denied. See generally Wright and Graham, Federal Practice and Procedure, Vol 23 §5422, p. 630 (1980), and authorities cited. But see also, Commonwealth v. Wanis, 426 Mass. 639, 643-45 (1998) (court created special protection for certain internal affairs reports of police departments).